**Warren Arthur SIMS, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Civ. A. No. 15960.**

United States District Court
D. Maryland.

May 19, 1966.

Russell R. Reno, Jr., and Luke Marbury, Baltimore, Md. (by Court appointment), for petitioner.

Thomas J. Kenney, U. S. Atty., and Robert W. Kernan, First Asst. U. S. Atty., for respondent.

WINTER, District Judge:

Petitioner is serving consecutive sentences of twenty-four years and eighteen years, respectively, imposed upon his pleas of guilty to (a) armed bank robbery (Criminal Action No. 26448), known as the "Oxon Hill case," and (b) bank robbery (Criminal Action No. 26574), known

as the "second Bensonhurst case." Both sentences were imposed July 7, 1964.

By motion under 28 U.S.C.A. § 2255, petitioner seeks to vindicate an alleged denial of his constitutional rights and, alternatively, to set aside his conviction and withdraw his pleas of guilty, pursuant to the provisions of Rule 32(d) of the Federal Rules of Criminal Procedure, which permits a conviction to be set aside and a plea of guilty withdrawn when necessary to correct manifest injustice. The claim to relief is predicated upon the assertion that the pleas of guilty were not voluntary because (a) by reason of incorrect advice of his Court-appointed counsel, petitioner was under a misapprehension as to the maximum penalty which could be imposed on him for conspiracy charged in the Oxon Hill indictment so that he failed to understand a comparison between the penalties which could be imposed on his pleas of guilty and the penalties to which he would be exposed if he went to trial; (b) his Court-appointed counsel was incompetent in representing petitioner, to the end that (i) petitioner was not furnished with proper information or proper advice to be able voluntarily and understandingly to plead guilty, and (ii) petitioner's counsel failed to file and press a pretrial motion to suppress evidence illegally obtained—itself incompetent representation and having as its tainted fruit a guilty plea; and (c) the guilty plea was the fruit of an unconstitutional search and seizure. Extensive evidence supporting and opposing the motion was taken, the points involved thoroughly briefed, and argument had thereon.

*History of the Proceedings:*

On or about December 31, 1962, the Bensonhurst National Bank, located at 837 Flatbush Avenue, Brooklyn, New York, within the Eastern District of New York, was robbed of the approximate sum of $8,018.00. In October, 1963, petitioner, together with Erwin Roland Ghee and Andrew Chappell, was indicted in the United States District Court for the Eastern District of New York, in a single-count indictment, for a violation of 18 U.S.C.A. § 2113(a). This robbery was the first Bensonhurst case and plays little part in these proceedings. After petitioner was sentenced on his pleas of guilty in the Oxon Hill case and the second Bensonhurst case, this indictment was dismissed in the Eastern District of New York, in accordance with the representation made to the Court at the time petitioner pleaded guilty in the second Bensonhurst and Oxon Hill cases.

On February 26, 1963, the Bensonhurst National Bank was robbed a second time, of the approximate sum of $30,690.00, and, in October, 1963, petitioner, together with Robert John Ugaro, Joseph Clinton Carlisle, Harry Goody, Jr., Erwin Roland Hayes Ghee, Bertha Jeanne Watts, and Charles Wilkerson, was indicted, in the United States District Court for the Eastern District of New York, in a three-count indictment, charging, as to count 1, bank robbery by force and violence or by intimidation, in violation of 18 U.S.C.A. § 2113(a), as to count 2, armed bank robbery, in violation of 18 U.S.C.A. § 2113(d), and, as to count 3, conspiracy to commit bank robbery and armed bank robbery, in violation of 18 U.S.C.A. § 371.

On July 8, 1963, the Citizens Bank of Maryland, Eastover Branch, Oxon Hill, Maryland, was robbed of the approximate sum of $142,000.00, and petitioner, together with Ugaro, Ghee, Goody, and Watts, to whom reference has previously been made, and James C. Ross, James Donald Davis, Frances E. Davis, John Kent Smith, and Rosemary Spoone, was indicted, in Criminal Action No. 26334, in a two-count indictment charging, as to count 1, bank robbery by force and violence or by intimidation, in violation of 18 U.S.C.A. § 2113(a), and, as to count 2, armed bank robbery, in violation of 18 U.S.C.A. § 2113(d). This indictment was returned July 30, 1963 and was dismissed on May 8, 1964, after a superseding indictment, in Criminal Action No. 26448, had been returned on December 5, 1963. The superseding indictment was returned against the same defendants named in Criminal Action No. 26334,

and an additional defendant, Andrew Chappell, Jr., who had been named a defendant in the first Bensonhurst case. The superseding indictment contained six counts, charging, as to count 1, conspiracy to violate 18 U.S.C.A. § 2113 in violation of 18 U.S.C.A. § 371; as to count 2, bank robbery by force and violence or intimidation in violation of 18 U.S.C.A. § 2113(a); as to count 3, bank entry with intent to steal and purloin deposits, in violation of 18 U.S.C.A. § 2113(b); as to count four, armed bank robbery, in violation of 18 U.S.C.A. § 2113(d), and, as to count six, interstate transportation of a stolen motor vehicle in violation of 18 U.S.C.A. § 2312 and 18 U.S.C.A. § 2. Petitioner was not named a defendant in the fifth count. This count was returned only against Rosemary Spoone, and charged knowing possession of funds which had been stolen from the Oxon Hill Bank, in violation of 18 U.S.C.A. § 2113(c). Not all of the defendants were named with petitioner in count six.

Petitioner was apprehended, on September 23, 1963, by agents of the Federal Bureau of Investigation, in Philadelphia, Pennsylvania. He was taken before a United States Commissioner immediately after his arrest. He lacked counsel, but was visited by a representative of the legal aid society in Philadelphia, who gave him no advice. He was brought to Baltimore, Maryland, and lodged in the Baltimore City Jail, in October, 1963. In accordance with the then practice, the United States Attorney for the District of Maryland sent petitioner a copy of the indictment returned against him in Maryland and, because he was incarcerated, the United States Attorney inquired if petitioner was unable to employ counsel and, if so, whether he desired the Court to appoint counsel. Petitioner replied in the affirmative as to both inquiries, and the Court appointed Fenton

L. Martin, Esq., a former law clerk to Chief Judge Thomsen, and an attorney known by the Court to exhibit a high degree of competence in the performance of court appointments, as well as private litigation, to represent him. After his first interview with petitioner, Mr. Martin reported to the Court a reluctance on the part of petitioner to accept Mr. Martin as his counsel, and petitioner was brought before the Court on November 1, 1963 for interrogation regarding his representation. On that occasion, petitioner stated that he felt, and had the impression that Mr. Martin felt, that Mr. Martin was not competent enough to handle petitioner's case, a conclusion, if true, at variance with the Court's appraisal of Mr. Martin's competence and performance in other matters; but in recognition that petitioner should be allowed reasonable latitude in being satisfied with appointed counsel in such a serious case, the Court undertook to obtain an expression of petitioner's desires. Petitioner was asked if there was any particular person he wished to have represent him and, although petitioner knew no members of the Baltimore Bar, he was quite articulate in specifying the qualities that counsel to represent him should possess. He stated a desire for an attorney who " * * * had experience in bank robbery cases," but, when asked if he would be happier with somebody representing him who practiced exclusively in the criminal field, he replied, " * * * I wouldn't put exclusiveness, your Honor, as a prerequisite," but " * * * I do want him definitely to have had some experience in major crimes."

The Court thereafter appointed George L. Russell, Jr., Esq., an attorney having wide experience in criminal matters, and one who, in the estimation of the Court, had demonstrated a high degree of competence therein.[1] Mr. Russell filed an

1. Simultaneously with the appointment of Mr. Russell, the Court received a letter from petitioner suggesting another attorney. It was not acted on because Mr. Russell had already been appointed. This letter was not made part of the record of this hearing, but is part of the file of the writer. 28 U.S.C.A. § 2255 permits the Court to consider " * * * the files and records of the case * * *."

order for his appearance on December 20, 1963. On that date petitioner, Ugaro, Ghee, Goody, Smith, and Ross were arraigned on the Oxon Hill indictment and each pleaded not guilty to the counts in which they were named, except Ross, who did plead guilty to count 4, armed bank robbery. On the same date, Rosemary Spoone was arraigned and pleaded guilty as to count 5.

On December 30, 1963, Watts was arraigned and pleaded not guilty to the counts in which she was named. On January 15, 1964, several defendants, other than petitioner, filed pretrial motions and, on January 16, 1964, petitioner filed motions for a bill of particulars, discovery and inspection and severance. Similar motions were later filed on behalf of still other defendants and, on January 27 and 28, 1964, the Court heard a number of motions filed by defendants, other than petitioner, and, on March 9, 1964, heard the motions filed on behalf of petitioner, Ugaro, Smith, and Watts. Rulings on petitioner's motions were made March 20, 1964. The motion for severance was denied without prejudice; the motion for a bill of particulars was granted in part; and the motion for discovery and inspection was granted in part. Before the rulings, and on March 13, 1964, Chappell pleaded guilty to the conspiracy count. On March 20, 1964, before the rulings on petitioner's motions, Ghee pleaded guilty to the armed bank robbery count. On April 16, 1964, Watts pleaded guilty to the bank robbery by force and violence or by intimidation count, and, on April 17, 1964, petitioner pleaded guilty to the armed bank robbery count. Imposition of sentence on petitioner was suspended and, in fact, petitioner was not sentenced until all of his codefendants, except Smith and James Donald Davis, pleaded guilty. Smith had been tried and found guilty on several counts of the indictment in which he was named as a defendant, and it was concluded that Davis' case be held in abeyance because of the carrying out of psychiatric examinations on the difficult question of

whether he was competent to be tried. Davis was ultimately concluded to have been competent at the time of the commission of the offense and competent to be tried, his plea of guilty to the conspiracy count of the indictment was accepted, and he was sentenced January 7, 1965 to a term of four years, with recommended commitment to the Medical Center for Federal Prisoners, at Springfield, Missouri.

As to petitioner, the indictment in the second Bensonhurst case was transferred to the United States District Court for the District of Maryland, petitioner having evidenced a desire to plead guilty to the first count thereof at the time that he tendered a plea of guilty to the armed bank robbery count of the indictment in the Oxon Hill case on April 17, 1964, and the papers were physically received by the Clerk of this Court on April 22, 1964. On the same day, Mr. Russell, by Court appointment, entered his formal appearance for petitioner as to the second Bensonhurst indictment, and, on May 8, 1964, petitioner pleaded guilty to the bank robbery by force and violence or intimidation count (count 1). At the time of the plea, the Court was advised that the remaining counts of the indictment in the second Bensonhurst case would be nolle prossed in the United States District Court for the Eastern District of New York after sentencing in Maryland. When petitioner was sentenced in the second Bensonhurst case and the Oxon Hill case on July 7, 1964, the United States Attorney for this District sought, and was granted leave to nolle prosse those counts of the indictment in the Oxon Hill case, other than the armed bank robbery count (count 4), in which petitioner was named as a codefendant. Certified docket entries show that the remaining counts of the second Bensonhurst indictment were nolle prossed in the Eastern District of New York.

The instant proceedings were filed *pro se* on *November 9, 1964.* Counsel were appointed to represent petitioner and present his claims.

*Petitioner's Pleas and Their Legal Consequences:*

Petitioner's plea of guilty to the armed bank robbery count (count 4) in the Oxon Hill case, tendered and accepted on April 17, 1964, and his plea of guilty to the bank robbery by force and violence or intimidation count of the indictment in the second Bensonhurst case, tendered and accepted on May 8, 1964, should be discussed in greater detail.

On April 17, 1964, petitioner appeared before the Court with his counsel. His counsel advised the Court that there were pending against petitioner indictments in the two Bensonhurst cases in the Eastern District of New York and the Oxon Hill case in the District of Maryland, and that petitioner intended to tender a plea of guilty in the second Bensonhurst case, if the count of the indictment in that case to which the plea would be tendered was transferred to the District of Maryland. Counsel for the government stated that the United States Attorney for the Eastern District of New York verbally agreed to the transfer and agreed that the indictment in the first Bensonhurst case would be dismissed and the remaining counts of the indictment in the second Bensonhurst case nolle prossed if petitioner's plea of guilty to the second Bensonhurst indictment was accepted. After this initial colloquy, the matter of petitioner's change of plea to the fourth count of the Oxon Hill indictment was considered. Government counsel stated that if a change of plea were accepted the government would move to nolle prosse the remaining counts of the Oxon Hill indictment at the time of sentencing. The Court then questioned petitioner in compliance with Rule 11 of the Federal Rules of Criminal Procedure, which requires a determination that "the plea is made voluntarily with understanding of the nature of the charge."

Questions by petitioner's counsel and the Court disclosed that petitioner completed the eighth grade of schooling in Vicksburg, Mississippi, and had no trouble in reading or writing. He read the count to which he tendered the plea and understood it. The Court explained the count to him, and he stated that he understood the crime with which he was charged. He also stated his understanding that, even if he were guilty of the crime, he had a right to a trial and a right to require the government to prove him guilty of the charge beyond a reasonable doubt. Notwithstanding, he desired to give up his right to a trial. He stated that, without any reservation in his mind, he was guilty of the crime to which he tendered the plea, and he denied that anyone made any threats, put any pressure on him, or made any promises to him to get him to plead guilty. As to possible punishment which might be imposed, the following colloquy occurred:

" * * *

"THE COURT: * * * I ask you, Mr. Sims, if I accept your plea of guilty, do you know what possible penalty could be imposed on you for this crime? I am not at this point telling you what I would do. I know nothing about you; I know practically nothing except what is charged in the indictment about the crime, but I ask you: Do you understand that if I accept your plea of guilty, the law would authorize me to imprison you up to twenty-five years or fine you up to $10,000.00, or both?

DEFENDANT SIMS: Yes, sir.

THE COURT: With that knowledge, you still wish to plead guilty to this case?

DEFENDANT SIMS: I do, sir.

THE COURT: Mr. Sims, I ask you also: Has anybody suggested to you that if you waive your right to a trial, in other words, if you plead guilty, come in here and get it over with without any fuss, that in fixing punishment that I would be more lenient toward you than if you exercised your right to a trial, went to trial and were found guilty?

DEFENDANT SIMS: No one has implied that, sir.

THE COURT: Has anybody suggested to you that if you plead guilty, Mr. Sims, that the United States Government would recommend more lenient treatment of you insofar as the imposition of punishment is concerned than if you exercised your right to a trial and were found to be guilty?

DEFENDANT SIMS: No one has so suggested, sir.

THE COURT: Has anybody suggested to you that if you plead guilty and if it becomes necessary to try one or more of your co-defendants in this case, that if you would further become state's witness, as it were, in other words, testify as a witness for the Government, that you could expect any more favorable consideration from the Court?

DEFENDANT SIMS: No, sir.

THE COURT: Or that you could expect any more favorable recommendation from the United States Government in regard to sentence?

DEFENDANT SIMS: No one has implied that either, sir."

The Court concluded and stated that it would accept the plea and defer final disposition until a presentence investigation was conducted and a presentence report was prepared.

The Court then took up the matter of petitioner's consent under Rule 20 of the Federal Rules of Criminal Procedure to the transfer of the first count of the indictment in the second Bensonhurst case from the Eastern District of New York to the District of Maryland. On this subject, *inter alia*, the following colloquy occurred:

"MR. RUSSELL: Now, it is your intention, Mr. Sims, to plead guilty to the First Count of that indictment, is that correct?

DEFENDANT SIMS: That is correct, sir.

MR. RUSSELL: And it has been explained to you, and you understand, that the maximum penalty that may be imposed upon you in that indictment is twenty years imprisonment or $10,000 fine, or both, is that correct?

DEFENDANT SIMS: Yes, sir.

MR. RUSSELL: And have you been advised and do you understand that you have a right to be tried in the Eastern District of New York where this alleged crime occurred, if you so desire?

DEFENDANT SIMS: Yes, I have.

MR. RUSSELL: And understanding all of this, is it your voluntary desire and express will that you—that this case be transferred to the District of Maryland before this Court for the purpose of entering a plea of guilty to the First Count?

DEFENDANT SIMS: That is my desire."

After this colloquy, petitioner was questioned by his counsel as to whether he understood the written consent to transfer and desired to sign it, both of which questions were answered affirmatively, and the Court questioned petitioner to satisfy itself that petitioner knew that he had a right to be tried in the Eastern District of New York, and that no threats, promises or pressure had been put upon him to obtain his agreement to the transfer or statement that he intended to plead guilty in that case.

Petitioner's next appearance was on May 8, 1964, when physical transfer of the second Bensonhurst indictment to this Court had been accomplished. Again, in compliance with Rule 11 of the Federal Rules of Criminal Procedure, petitioner was questioned as to whether he had read the first count and whether he understood the charge made against him. Petitioner acknowledged knowing of his right to a trial and the right to require the government to prove him guilty beyond a reasonable doubt, as well as the lack of obligation on his part to admit his guilt. Petitioner denied that anyone had made any threats or promises or exercised any pressure to induce him to plead guilty, and he expressed no reservation that he, or other defendants with his aid and comfort and his knowl-

edge, committed the bank robbery as charged in the first count of the second Bensonhurst indictment. The transcript shows that, thereafter, the following occurred:

"THE COURT: Has anybody suggested to you, Mr. Sims—well, first of all, if your plea of guilty is accepted you realize, you know what possible maximum sentence could be imposed upon you?

DEFENDANT SIMS: Yes, sir.

THE COURT: Specifically, do you understand that you could be imprisoned for twenty years or fined up to $5,000.00, or both, for this charge?

DEFENDANT SIMS: Yes, sir.

THE COURT: And this, of course, could be in addition to any other punishment which might be visited upon you for any other crime which you may have committed at any other time?

DEFENDANT SIMS: Yes, sir.

THE COURT: In other words, what I am saying is, you understand that the sentence which could be imposed here could be made consecutive with any other sentence that could be imposed on you?

DEFENDANT SIMS: Yes, sir, I understand that.

THE COURT: I ask you, Mr. Sims, did anybody suggest to you that if you come into court and admit your guilt and do not insist upon a trial that in imposing sentence that I would be more lenient with you than if your [sic] exercised your right to a trial and were found guilty?

DEFENDANT SIMS: No one has so suggested.

THE COURT: Mr. Kernan, are there any additional questions which occur to you that should be asked of Mr. Sims?

MR. KERNAN: None, your Honor.

THE COURT: Do you know of any, Mr. Russell?

MR. RUSSELL: Only, Your Honor, that Mr. Sims having previously pleaded guilty to a count in the bank robbery in Maryland the maximum penalty in that particular indictment is twenty five years and in this indictment the maximum penalty, in so far as incarceration is concerned, is twenty years making a total possible sentence of a maximum forty five years that may be imposed upon you, do you understand that?

DEFENDANT SIMS: Yes, sir.

MR. RUSSELL: And do you understand that this does not necessarily mean that this is the sentence the Court will impose but it is what the Court is authorized to impose upon you, the maximum, in addition to any possible fines. Do you understand that?

DEFENDANT SIMS: Yes, I do.

MR. RUSSELL: And understanding this do you nevertheless persist in your plea of guilty?

DEFENDANT SIMS: I do.

THE COURT: Thank you, Mr. Russell. I am willing to accept the plea of guilty."

Again, a presentence investigation and presentence report were requested, and sentencing postponed until the same had been completed.

It should be noted, also, that, on July 6, 1964, when petitioner and his several codefendants came on for sentencing, counsel for petitioner, who was the first attorney to speak on behalf of any defendants, said, with regard to his client:

"The defendant, as the Court is aware, pleaded guilty to the First Count of Criminal Indictment 63–CR–482 of the Eastern District of New York, and to the Oxon Hill bank robbery, the Fourth Count, and thereby exposed himself to a maximum penalty of forty-five years, in addition to any fines that the Court may deem proper to impose."

At a later stage of the proceedings, petitioner exercised his right of allocution. When he spoke in no way did he suggest that he was unaware that he could be

sentenced to an aggregate term of forty-five years.

The legal effect of a guilty plea on post conviction collateral attack upon the judgment has been considered in many cases, e. g., Sullivan v. United States, 315 F.2d 304 (10 Cir. 1963); Thomas v. United States, 290 F.2d 696 (9 Cir. 1961); Watts v. United States, 107 U.S.App.D.C. 367, 278 F.2d 247 (1960), which express the general rule that a voluntary guilty plea precludes collateral attack on a conviction based upon prior nonjurisdictional defects. The two leading cases in this Circuit are White v. Pepersack, 352 F.2d 470 (4 Cir. 1965), and Hipp v. Warden, Memo No. 9671 (4 Cir. 1964). See also, Rose v. State of Maryland, Memo No. 10,237 (4 Cir. 1966); Thomas v. Warden, Maryland Penitentiary, Memo No. 9566 (4 Cir. 1964); Moore v. Pepersack, Warden, Memo No. 9556 (4 Cir. 1964). In White v. Pepersack, supra, a defendant charged with murder elected to testify at his trial and admitted committing the homicide with which he was charged. The question was whether this admission barred him from attacking collaterally the use of illegally obtained evidence, a confession claimed to have been involuntary, and testimony claimed to have been perjured. The trial court held that the judicial confession barred defendant just as a voluntary guilty plea might have done, but the United States Court of Appeals reversed, on the ground that the purpose of defendant's testimony was to controvert the inference of premeditation which the state's case, viewed alone, would have supported, and was not tantamount to a voluntary guilty plea. In arriving at this result, the Court stated the effect of a voluntary guilty plea, saying:

> "It is a familiar principle that a voluntary plea of guilty does foreclose subsequent collateral attack upon the judgment and the sentence when the attack is based upon an alleged deprivation at some earlier stage of the proceedings.[6] The guilty plea is

6. See, for instance, Watts v. United States, 107 U.S.App.D.C. 367, 278 F.2d 247; Sullivan v. United States, 10 Cir., 315 F.2d 304.

> acceptable however, only after a searching inquiry to assure that its tender is voluntary. Even so, *the plea is not a bar to a subsequent collateral attack if it is found in those proceedings that, because of the alleged deprivation, the plea was involuntary.* The rule is applied in recognition of the fact that a *defendant, aware that a confession may be excludable as involuntary, may still enter a truly voluntary plea of guilty if he also knows that other admissible evidence will establish his guilt overwhelmingly.* If it appears, however, that the plea was the coerced product of a tainted confession, the involuntary plea, entered in ignorance of his rights, does not bar the collateral attack.[7]

7. See, Watts v. United States, 107 U.S. App.D.C. 367, 278 F.2d 247."

352 F.2d at 472. (Emphasis supplied.)

Hipp v. Warden, Maryland State Penitentiary, supra, arose when Hipp sought a writ of habeas corpus in this Court. It appeared that, represented by court-appointed counsel, he had pleaded not guilty to murder and was tried and acquitted; but that he had pleaded guilty to a charge of robbery for which he had been sentenced. In his habeas petition, Hipp complained, *inter alia,* of illegal arrest, illegal search and seizure, an involuntary confession, denial of effective assistance of counsel, and an involuntary plea of guilty. In dismissing the appeal as frivolous, the United States Court of Appeals made the following statement:

> "Because a voluntary, uninduced, and uncoerced entry of a guilty plea ordinarily forecloses federal habeas corpus inquiry into alleged irregularities in the proceedings, Thomas v. Warden, No. 9566 (4th Cir. 1964) (memorandum opinion); Sullivan v. United States, 315 F.2d 304 (10th Cir. 1963); Broadus v. Lowry, 245 F.2d 304 (6th Cir. 1957), we turn first to

the issue of whether or not Hipp's plea was voluntarily entered.

"Hipp argues that the totality of the illegal and unconstitutional conduct which he has alleged had the cumulative effect of making him plead guilty.

"Indeed, if, as alleged, Hipp's constitutional rights were violated prior to and at his trial, he would not hesitate to hold that the plea of guilty was not freely and voluntarily entered. However, the finding of the District Court that none of Hipp's constitutional rights were violated is correct and is amply supported by the record."

 Waiver is "an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966). A guilty plea may constitute a waiver of preconviction defects; and when it is shown that the plea constitutes a waiver, collateral attack on the plea, based upon such defects, is foreclosed. The effect of a factually voluntary plea—one made not as a result of threat, coercion or promise of leniency—may be, however, more encompassing in scope than a waiver, because such a plea forecloses collateral attack based upon preconviction defects, known or unknown, which did not influence the plea, in addition to those of which a defendant was aware and which he intended not to pursue. Only where collateral attack is based upon an actual violation of constitutional right, unsuspected by a defendant at the time he made his plea, which had some influence in causing the plea may the collateral attack be successful.

 The recitation of the proceedings at which petitioner's guilty pleas were tendered and accepted amply demonstrates that they were factually voluntary. There remain to be considered the questions of whether there were preconviction defects and, if so, the extent to which they were or were not known to the petitioner, and the extent to which they did or did not affect his decision to plead.

*Misadvice as to Penalty:*

The previous recitation of the rearraignment proceedings and an examination of the proceedings on final disposition establish beyond peradventure of doubt that petitioner knew that he was tendering pleas which could expose him to maximum confinement of forty-five years. In fact, petitioner received sentences of confinement aggregating forty-two years. Petitioner's claim that he was misadvised as to the penalty which could be imposed relates *not to the counts of the two indictments to which he pleaded guilty, but solely to the first count of the Oxon Hill indictment to which he pleaded not guilty and which was ultimately nolle prossed.* Decision of petitioner's contention in this regard must begin with finding the facts in an area where the evidence is conflicting.

Petitioner testified that he was advised by Mr. Russell that the conspiracy count (count 1) of the Oxon Hill indictment carried a maximum penalty of twenty years. In fact, this count, which was based on 18 U.S.C.A. § 371, carries a maximum penalty of five years. Petitioner also testified that he knew that the armed bank robbery count of the Oxon Hill indictment (count 4) carried a maximum penalty of twenty-five years, that the counts of less aggravated bank robbery (counts 2 and 3) would be merged into the armed bank robbery count if petitioner were convicted of the latter, and petitioner thought that he had been indicted for violations of the Dyer Act in regard to two cars, each carrying a maximum penalty of five years. Actually, petitioner was indicted for only a single violation of the Dyer Act. Based upon his erroneous belief as to the penalty for conspiracy and the number of Dyer Act violations, petitioner thought that he was exposed to a possible maximum penalty of fifty-five years under the Oxon Hill indictment.

By petitioner's testimony, he was not concerned with either of the Benson-

hurst prosecutions, because in the first he was arrested so late that he thought the government must have a weak case and, as to the second, he had only been the driver of the vehicle in which the actual robbers were transported to and from the bank, and he knew that none of the other defendants would testify against him. Petitioner had been advised by Mr. Russell that he would unquestionably be convicted of conspiracy under the Oxon Hill indictment, and he further testified that *had he known* that the conspiracy count carried a maximum penalty of only five years (a) he would have risked the supposed maximum penalty of fifty-five years against a sure penalty of five years, rather than to expose himself to a maximum penalty of twenty-five years, and (b) he would not have consented to transfer or to plead guilty to the first count of the second Bensonhurst indictment. The Court understands that petitioner was saying that he believed Mr. Russell's advice that he would be proved guilty of conspiracy and had he known that that charge carried a maximum penalty of only five years, rather than twenty, he would have risked a trial and risked additional penalties in the Oxon Hill case. He did not think that he would be tried and convicted in the two Bensonhurst cases.

Petitioner, to support his allegation that he misunderstood the maximum penalty for conspiracy, testified about an incident which occurred in the Marshal's lockup prior to the beginning of the proceedings on final disposition on July 6, 1964. At the time, petitioner testified he was in company with Goody, Ghee, and Chappell, and these four were speculating on the sentences they were about to receive. Chappell, who had pleaded guilty to the conspiracy count of the Oxon Hill indictment, asserted that he could get a maximum sentence of five years. Petitioner countered that Chappell could get twenty years, while Chappell rejoined that his lawyer and the Court had advised him that the maximum sentence he could receive was five years. At this point Lowell R. Bowen,

Esq., Court-appointed counsel for Ghee, came to the lockup for a last minute conference with his client and, according to petitioner, Mr. Bowen was asked what was the maximum sentence for conspiracy. Mr. Bowen replied that he did not know, but he would look the matter up, whereupon he examined some papers in his brief case and told petitioner that the maximum penalty was twenty years or $5,000.00 fine, or both. Mr. Russell came to the bullpen thereafter to see petitioner, and also stated that maximum imprisonment was twenty years, so that petitioner told Chappell, " * * * If you don't believe it just wait and see." According to petitioner, it was not until after he was removed to the Federal Penitentiary in Atlanta, Georgia and saw a newspaper clipping about the conviction of a prominent labor leader on a charge of conspiracy stating that a five-year maximum sentence could be imposed, that he knew that he had been acting upon misadvice.

In his testimony that he believed the maximum penalty for conspiracy to be twenty years, petitioner was corroborated by other evidence and contradicted by still other evidence.

Mr. Bowen testified he remembered going to the Marshal's lockup prior to court being convened on July 6, and he remembered being asked a question by a defendant other than his client about a matter under discussion among several prisoners. Mr. Bowen had no recollection of speaking to petitioner, nor any recollection of the specific question which was asked him by the unidentified defendant; but at the time he went to the lockup, Mr. Bowen did have in his possession a copy of the indictment with the notation thereon that the penalty for conspiracy was $10,000.00 or five years, or both, and the penalty for violation of 18 U.S.C.A. § 2113 (simple bank robbery) was $5,000.00 or twenty years, or both. Mr. Bowen thinks that the incident described by petitioner could have taken place, and, if he had been asked the penalty for conspiracy, he could have read the notation on his copy of the

indictment as to the more severe penalty for bank robbery.

Codefendants Chappell and Ghee both testified and supported petitioner's version of the advice given him in the Marshal's lockup on the morning of July 6, both as to the circumstances under which the discussion arose, the identity of Mr. Bowen as the attorney who was consulted, and the advice Mr. Bowen gave petitioner as to a twenty-year maximum. It does not appear that petitioner, Chappell, and Ghee had the opportunity to fabricate such consistent versions, especially considering that Chappell is serving his sentence in Marion, Illinois, while the others are serving in Atlanta, Georgia. Petitioner's codefendant Goody testified substantially to the same occurrence, although he is a less credible witness.

Opposed to petitioner's testimony is that of Mr. Russell, who testified not only that he had not advised the petitioner that the penalty for conspiracy was five years, but that he had not advised petitioner as to any specific penalties, although he and petitioner both understood that total maximum penalties on both indictments were far in excess of forty-five years; and Mr. John W. Spurrier, Chief Deputy United States Marshal for the District of Maryland. Mr. Spurrier was produced to establish that petitioner was not housed in the lockup such that the conversation between petitioner, Chappell, Ghee, and Goody about the penalty for conspiracy could have taken place. Mr. Spurrier recalled where petitioner was placed, but he had no independent recollection as to the others. Mr. Spurrier's recollection of where petitioner was placed, i. e., the "cell on the left," is corroborated by the testimony of Goody (an unbelievable witness) but contradicted by the testimony of petitioner, Chappell, and Ghee. Mr. Spurrier did identify a memorandum which proved that Chappell, Ghee, and Goody were to be placed in one cell, and

petitioner, Ross, and Ugaro in another, relatively non-communicating, cell, and he was certain that the instructions in the memorandum were carried out. Although the Court deems Mr. Spurrier a thoroughly credible witness, his recollection of actual events is too slight to prove that the conversation did not take place.

In view of all of the evidence on this point, the Court is satisfied that it is more likely true than not that petitioner was advised by Mr. Russell that the maximum penalty for conspiracy was twenty years. The Court deems it highly unlikely that Mr. Russell did not discuss specific penalties with his client (although not impossible because of their primary interest in a "package deal"), but not at all unusual that Mr. Russell would have no specific recollection of such discussions in the numerous conferences with his client, and that Mr. Russell, an active practitioner in the criminal courts of the State of Maryland, as well as this Court, could confuse the twenty-year maximum penalty for conspiracy to commit armed robbery under state law, Annotated Code of Maryland, Article 27, § 38,[2] with the maximum penalty for conspiracy under federal law.

This is not to say, however, that petitioner's plea was thereby rendered involuntary. As a factual matter, petitioner's testimony that he would not have pleaded guilty to the armed bank robbery count of the Oxon Hill indictment and that he would not have consented to a transfer of the second Bensonhurst indictment and pleaded guilty to the first count thereof if he had known that the maximum penalty for conspiracy was five years is not convincing. Mr. Russell testified that he advised petitioner that the entire Oxon Hill indictment was indefensible and not, as petitioner alleges, that only the conspiracy count was indefensible. The Court believes Mr. Russell's version of what he told petitioner.

2. Maryland law fixes the penalty for conspiracy as the penalty attaching to the substantive crime a defendant conspired to commit. The Maryland penalty for robbery with a deadly weapon is twenty years. Annotated Code of Maryland, Article 27, § 488.

If there be ascribed to the Oxon Hill indictment the correct aggregate maximum penalties which could be imposed upon petitioner (giving effect to the doctrine of merger and the fact that petitioner was indicted for only one violation of the Dyer Act), petitioner's maximum exposure was to an aggregate term of thirty-five years. The Court cannot accept petitioner's attempt to minimize the two Bensonhurst indictments to the extent that petitioner attempts to do, because the Court is satisfied from observing and hearing from petitioner on many occasions that petitioner would not have pleaded guilty to the count of the second Bensonhurst indictment if he really believed the count could not be proved. Certainly, in the absence of convincing reasons, and none have been advanced here, the Court cannot accept petitioner's statement that he was justified in assuming that the government would abandon its prosecution of both Bensonhurst indictments. Rather, petitioner must be assumed to be well aware of both Bensonhurst indictments and assumed to know that they will be pressed by the government until he has good reason to believe otherwise. Contrary to his testimony, the legally permissible alternatives with which he dealt in deciding whether to plead guilty were not restricted to the Oxon Hill indictment.

Since petitioner admitted that he knew, even before advice from the Court, that the penalty for armed bank robbery charged in the second Bensonhurst indictment was twenty-five years, and the penalty for bank robbery by force and violence or by intimidation charged in both of the Bensonhurst indictments was twenty years, it can hardly be said that petitioner was effectively misled, because he was bound to know that his total exposure was well in excess of forty-five years. Petitioner was forty years old at the time that he appeared before the Court. If he knew that he was exposed to maximum penalties of at least forty-five years, it would make little difference as to the extent of his exposure in excess of forty-five years.

Whether forty-five years or more, if petitioner received maximum sentences, he would be eligible for parole after fifteen years, 18 U.S.C.A. § 4202. If petitioner were required to serve aggregate sentences of forty-five years or more, even with good time and work allowances, he is chargeable with knowledge that there will be some limit to the duration of his life span.

The key to resolution of this issue lies in the fact that petitioner unquestionably knew that his maximum exposure to the two counts to which he pleaded guilty was forty-five years. Counsel are frank to concede and, on the basis of its own research, the Court agrees, that there is no case in which a motion under 28 U.S.C.A. § 2255 was granted, or a plea withdrawn under Rule 32(d), *where the alleged misadvice related to counts of the indictment to which a plea was neither tendered nor accepted.* The leading case in this Circuit on misadvice in general is Pilkington v. United States, 315 F.2d 204 (4 Cir. 1963), where the sentencing judge, who accepted a plea of guilty, had advised a youthful offender that the maximum penalty attaching to a violation of the Dyer Act, with which he was charged, was five years, but proceeded to sentence him, under the Federal Youth Corrections Act, 18 U.S.C.A. § 5005 et seq. where, assuming a violation of probation after initial mandatory release, his incarceration for a total of six years could ensue. The Court held that the facts were enough to raise a doubt as to the voluntariness of the plea and thus to require a hearing on a motion made under § 2255, saying:

"More particularly, where, in petitions under 28 U.S.C.A. § 2255, it has been alleged that pleas of guilty were entered because the defendant was misled by statements of the presiding judge or prosecuting officials, or even under some circumstances *of his own attorney,* with regard to the nature of the charge or the possible penalty involved, hearings on such allegations have been ordered." 315 F.2d at 207. (Emphasis supplied.)

\* \* \*

"Whether or not the guilty plea was made voluntarily and understandingly is a question of fact to be determined after an inquiry. A hearing may disclose that Pilkington, before pleading guilty, was *actually aware* of the possible penalties under the Federal Youth Corrections Act, having been informed by his attorney or by the probation officer with whom he conferred prior to trial, or by someone else." Id. at 209. (Emphasis supplied.)

To like effect are Machibroda v. United States, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); Munich v. United States, 337 F.2d 356 (9 Cir. 1964); United States v. Davis, 212 F.2d 264 (7 Cir. 1954); Aiken v. United States, 282 F.2d 215 (4 Cir. 1960).

■ Generally, a mere, unfulfilled hope held out by a defendant's attorney, or even the prosecutor, has been held in this Circuit not to justify the striking of a guilty plea. Meredith v. United States, 208 F.2d 680, 681–682 (4 Cir. 1953); United States v. Baysden, 326 F.2d 629, fn. 3 (4 Cir. 1964) (dictum). See also, United States v. Horton, 334 F.2d 153 (2 Cir. 1964).

In United States v. Parrino, 212 F.2d 919 (2 Cir. 1954), mistaken advice as to the collateral effects of a guilty plea has been held not sufficient to warrant authorizing the withdrawal of a guilty plea. There, counsel had advised his client that a guilty plea would not subject him to deportation. The misadvice was proved and reliance assumed; however, the Court said:

"Moreover, here the subject-matter of the claimed surprise was not the severity of the sentence directly flowing from the judgment but a collateral consequence thereof, namely, deportability. This is a liability which may, and in this case does, depend on a conviction of crime. But it is nonetheless a collateral consequence of conviction. It is true that many statements in judicial opinions and by textwriters may be found—and the appellant here cites several such—to the general effect that a defendant should not be holden to a plea of guilty made without an understanding of the consequences. But neither the generalities found in the texts nor the facts underlying such judicial opinions suggest that the authors of such statements meant to imply that the finality of a conviction on a plea of guilty depended upon a contemporaneous realization by the defendant of the collateral consequences thereof. Certainly, the appellant fails to cite a single case so holding.[5] And research of our own fails to disclose a case even intimating a rule of such breadth." (footnote eliminated) Id. at 921–922.

Not all circuits have been as liberal in protecting the rights of an accused as the Fourth Circuit in *Pilkington* supra. In Georges v. United States, 262 F.2d 426 (5 Cir. 1959), an attorney selected and employed by two defendants advised one that he could be sentenced to a maximum term of five years, and the other that he could be sentenced to a maximum term of ten years, when both were liable for sentences of ten to forty years. The first defendant received a sentence of fifteen years, and the second received a sentence of eighteen years. Even so, the Court upheld a denial of their motion to strike their guilty pleas, saying, "We think the rule, several times declared, is and should be that manifest injustice does not result from a plea of guilty following erroneous advice of counsel as to the penalty which could be imposed." Id. at 430. And, in Moore v. United States, 334 F.2d 25 (5 Cir. 1964), counsel had told a defendant that he would receive a minimum sentence, but when he did not the Court said that such misadvice was not enough to set aside the plea because the most that could be said was that the defendant was misled by the misrepresentation of counsel of his own choosing. Of significance, also, is Smith v. United States, 116 U.S.App. D.C. 404, 324 F.2d 436 (D.C.Cir. 1963), cert. den. 376 U.S. 957, 84 S.Ct. 978, 11 L.Ed.2d 975 (1963), a case where an at-

torney failed to advise a second offender under the narcotics law that he would be ineligible for parole on his plea of guilty. In regard to this failure to advise as a grounds for a motion under § 2255 the Court said:

"If the allegation that Smith was misled by his appointed counsel is to be cognizable under 28 U.S.C.A. § 2255 as a ground for vacating the judgment, it must amount to an allegation of ineffective assistance of counsel of such a kind as to shock the conscience of the court and make the proceedings a farce and a mockery of justice. We think it falls far short of doing so." 324 F.2d at 439–440.

 It can be fairly said that in the cases in which relief has been granted under § 2255 or Rule 32(d) the misadvice or failure of advice related to the particular charge to which the defendant was pleading guilty. In exercising its supervisory function over lower federal courts, the Supreme Court, in promulgating Rule 11 has required only that a plea be entered "voluntarily with understanding of the nature of the charge." Petitioner fully understood the charges upon which he was sentenced and the consequences of pleading guilty to them when he entered his plea. This Court is of the view, notwithstanding the decision in *Georges, Moore* and *Smith*, supra, but in accordance with the decision of the *Pilkington* case and related authorities, that a plea of guilty is not made understandingly if a defendant does not know the maximum sentence which can be imposed on the charges to which the plea is tendered, whether by reason of misadvice or nonadvice of the Court, of his counsel, or of someone else, and relies on such misadvice or nonadvice; but this Court concludes that neither Rule 11 nor any known constitutional right requires that a defendant be advised or aware of the correct maximum penalties attaching to charges which are not pressed against him and on which he is not sentenced. The aspect of petitioner's case considered here is entirely of the latter

category and petitioner is not entitled to relief under § 2255 or Rule 32(d).

### Counsel's Alleged Inattention and Failure to Press Motion to Suppress—Influence on Petitioner:

Previously mentioned and considered has been petitioner's testimony that he was led to plead guilty because of his attorney's incorrect advice as to the penalty for conspiracy. Although, according to petitioner, this was the weightiest factor affecting his decision to plead, he testified that he was also influenced by Mr. Russell's general inattention to the case, apparent lack of preparation on the eve of scheduled trial, and, particularly, Mr. Russell's failure to present and press a pretrial motion to suppress certain evidence seized as a result of a search of his sister's house in New York City.

 The legal sufficiency of Mr. Russell's representation of petitioner will be considered on its merits in due course, but in the light of the implications of White v. Pepersack, supra, and Hipp v. Warden, supra, it is appropriate to consider first the extent to which Mr. Russell's alleged deficiencies in representing petitioner, influenced petitioner in arriving at a decision to plead guilty. The Court disbelieves petitioner's testimony that any deficiencies in Mr. Russell's representation of petitioner played any part in petitioner's conclusion to enter pleas of guilty. The Court finds that petitioner concluded to plead guilty for motives which, as will be shown, he, himself, expressed, having nothing to do with the manner in which he was represented. This finding rests on the following:

Petitioner's course of conduct, prior to the imposition of sentence and the filing of the instant motion, amply demonstrates that he was discriminating as to the quality of his representation and that he was fully aware of his right to have competent counsel. When Mr. Martin, as the first court-appointed counsel, interviewed petitioner, petitioner was not reticent in telling him or, when produced in court, telling the Court, that he

lacked confidence in Mr. Martin's ability. After his appearance in court in regard to the appointment of counsel, petitioner clearly understood that he had a right to communicate with the Court about the quality of his representation, as evidenced by his letter suggesting a nominee to be appointed.

When Mr. Russell was appointed and interviewed Mr. Sims for the first time he was told, according to his testimony which stands undenied by petitioner, that petitioner was doubtful about his competency and qualifications and would not talk to him unreservedly until petitioner had "checked him [Mr. Russell] out in New York," and let him know if he were acceptable. Petitioner, by cryptic message, subsequently advised Mr. Russell that he "checked out fine." Even by petitioner's version of his conferences with Mr. Russell, which differs sharply from Mr. Russell's version, petitioner admitted that he obtained from a New York attorney, and furnished to Mr. Russell, a legal memorandum on illegal search and seizure and that Mr. Russell gave him, and he studied, some of Mr. Russell's writings on this subject. What Mr. Russell did or failed to do in representing petitioner, aside from misadvice as to the penalty for conspiracy, was known to petitioner at the time his pleas were made, yet, on July 6, 1964, when petitioner exercised his right of allocution, he adopted the statement in his behalf by Mr. Russell, disclaimed any persuasion, coercion or inducement of his codefendants to participate in the crimes, and, significantly, added:

"Next, Your Honor, I would like to say that in spite of the fact that *this Court did appoint a very capable attorney for my defense in the person of Mr. Russell, and I was satisfied with his services,* Your Honor went to great extent to protect my rights on each occasion that I have had—that I have appeared in this court.
(Emphasis supplied.)

"Likewise, the treatment that I have received from the United States Marshals, the United States Attorneys, and the FBI in connection with this matter has been most decorous. I understand that this court and these other agents and departments of the Government are not in want of accolades but I, nonetheless, feel obliged to say these things because they are important, too."

Three days after this accolade, petitioner wrote to Mr. Russell requesting advice about a reduction of sentnce and the return of certain papers, *not mentioning any complaint about Mr. Russell's services and suggesting that Mr. Russell be "retained" to afford further representation.*

From the chronology recited in the section of this opinion "History of the Proceedings," Rosemary Spoone, as well as Chappell and Ghee pleaded guilty to various counts of the Oxon Hill indictment before petitioner pleaded guilty. Petitioner knew that these pleas had been entered, and petitioner had read and discussed with Mr. Russell several affidavits upon which warrants of arrest had been issued, so that petitioner knew tha'. the F. B. I. knew he had driven the car in which those who entered the Oxon Hill bank were transported to and from the bank on the third and successful robbery attempt, and that he had used the apartment of Mr. and Mrs. Davis in connection with the bank robbery. Additionally, Mr. Russell had inspected the evidence obtained from petitioner's sister's apartment and advised petitioner what it was, and petitioner was aware that several of the defendants who pleaded guilty prior to his plea would probably testify against him. The conclusion is inescapable that petitioner was well aware of the sufficiency of the evidence to convict him on the substantive counts of the indictment in the Oxon Hill case.

Petitioner's awareness of these facts and his reasons for pleading guilty, including lack of reliance on Mr. Russell's alleged deficiencies as an attorney, are amply demonstrated by the testimony on cross examination which petitioner gave when he appeared as a witness for the government in the trial of John Kent

Smith, the only codefendent to stand on his pleas of not guilty and to go to trial, as well as a statement of his reasons for pleading guilty, which petitioner prepared at the suggestion of Mr. Russell and an Assistant United States Attorney immediately prior to his appearance as a witness in the Smith trial. Although the references are lengthy, these statements are of sufficient importance to be set forth verbatim.

The cross examination of petitioner at the Smith trial had to do with his reasons for concluding that he would be a witness for the government in that case. When the testimony is read as a whole it establishes that on *April 17, 1964* petitioner pleaded guilty to count 4 of the Oxon Hill indictment and, *a few hours thereafter*, after consulting with Mr. Russell, petitioner made a statement to the F. B. I. In the quoted testimony the date of the statement is referred to as April 20, but later, in redirect examination, petitioner acknowledged that he was referring to April 17. The answers petitioner gave have a direct bearing on his reasons for pleading guilty, since the statement was made only a few hours after the plea was entered in the Oxon Hill case and before the plea in the second Bensonhurst case: Petitioner testified:

"BY MR. HARGROVE:

\* \* \* \* \* \*

"Q \* \* \* Now, Mr. Sims, let's get back to your conversation with the federal Agents. Now, you were at that time charged in New York, were you not, with robbery of the Bensonhurst bank, isn't that correct?

A I don't know exactly when I was charged.

Q Well, you knew that you were charged at that time, did you not?

A At what time are you referring to?

Q I'm talking about April 20th of this year, 1964?

A Oh, yes.

Q You were charged with both of them, were you not?

A Yes, I was.

Q And there were indictments pending in New York?

A I don't think the indictments were pending. I don't think the indictments had been issued.

Q But you knew you were charged?

A Yes.

Q And you knew that you would have to go back to New York to stand trial on those charges, did you not?

A Well, I knew the charges existed. I knew that the indictment existed, yes.

Q And you also knew, Mr. Sims, at this time that other co-defendants had talked to the Government and had given statements concerning you, did you not?

A I knew that statements had been given, or I had been apprised of this information.

Q Concerning you, I'm referring to.

THE COURT: What you are being asked Mr. Sims, is this. Were you aware of the fact at that time that other defendants had given statements which implicated you, which mentioned your name?

THE WITNESS: I don't know it, Your Honor, but I had reason to believe.

THE COURT: All right.

BY MR. HARGROVE:

Q You had talked to these defendants from time to time in the jail, had you not, Mr. Sims?

A None of these defendants had told me to my face that they had given any information concerning me.

Q Well, you knew they had been taken in and out of the jail numerous times to talk with the Government, didn't you?

A But I had no copies of their conversation.

Q You knew that much, didn't you?

A I knew that much, yes.

Q You knew that the Government wasn't just talking to them about nothing, didn't you?

A I knew they were talking, yes.

Q And you said you saw Mr. Ghee. You were certainly aware that they had given—they had given statements which had talked about the bank robbery and everybody's involvement, were you not?

MR. KERNAN: I object to the form of the question, Your Honor. To whom were the statements given?

MR. HARGROVE: To the Government.

MR. KERNAN: When?

MR. HARGROVE: Prior to April 20th of this year.

THE COURT: I think he has already answered the question, Mr. Hargrove.

I think Mr. Sims has stated—and, Mr. Sims, please correct me if I misrepresent your testimony—that he knew that his co-defendants had been questioned by representatives of the Government. He did not actually know but he had reason to believe that they had given statements implicating him.

MR. HARGROVE: I don't think he went quite that far, Your Honor.

THE COURT: Am I correct, Mr. Sims, or not?

THE WITNESS: Yes, Your Honor. I had reason to believe that in their statements, it was possible that I was implicated.

BY MR. HARGROVE:

Q And, Mr. Sims, you were aware on April 20th that just about all of the defendants had entered pleas, were you not?

A Substantially, yes.

Q All except yourself, possibly Ugaro, I think yourself, Goody, Smith perhaps Mr. Davis, isn't that correct?

A Well, there was Chappell. I wasn't certain whether Chappell had entered a plea or not.

Q Well, you were aware that Mr. Chappell had entered a plea—

THE COURT: Let him answer the question, Mr. Hargrove.

A I wasn't certain whether Chappell had entered a plea. I had reason to believe that Mr. Goody had not entered a plea. I knew that Ugaro had not entered a plea. I had reason to believe that Roland Ghee had not entered a plea, and Bertha Watts, so I had reason to believe that she had not entered a plea, so there was quite a number that hadn't entered pleas at that point.

Q Are you positive of that, Mr. Sims?

A I'm not positive of it. I was in the Baltimore City Jail and I only—

Q Mr. Sims,—

THE COURT: Wait a minute. Let him answer, Mr. Hargrove.

Go ahead, Mr. Sims.

THE WITNESS: I was in the Baltimore City Jail and the only information that I had was such as I had seen in the papers, and according to the papers, it had stated that Ross had pleaded guilty, Rosemary Spoone had pleaded guilty, and some time later, I believe there was a publication that Mrs. Frances Davis had pleaded guilty.

Those were the only ones that I was sure of.

\* \* \* \* \* \*

BY MR. HARGROVE:

Q But you were aware that some of them had entered pleas on April 20th?

A Some of them, yes.

Q Now, did that have any bearing on your ultimately talking to the Government Agents?

A It had some bearing, yes.

Q You felt that now it was time for you to start talking, is that correct?

A Would you like for me to tell you what bearing it had, or would you like to suggest?

Q Yes, I'd like to know.

A Then I will tell you. The bearing it had was that I felt that some statements had been given and I felt that there was a possibility of some conflicting statements to have been given, due to the fact that some of the participants were not fully aware of all of the aspects of the operation as a whole.

I felt that as long as I was going to give a statement, I felt that there was no one that was in a better position to give a complete statement than I was in order to make a clean breast of the matter and to place everything and everybody in its proper perspective.

Q And also, you felt that some of these statements were inaccurate as far as your particular role, isn't that correct?

A It was possible that it could have been.

Q Therefore, it would affect you adversely, isn't that correct?

A So far as the effect, I don't think that I considered the statements in proportion to how they would affect me.

Q Well, you did consider that they might be inaccurate insofar as your particular role, isn't that correct?

A I felt they could have been inaccurate about a lot of different parts.

Q Answer my question, please. As far as yourself and not about something else.

THE COURT: He has already answered the question.

MR. HARGROVE: Your Honor, he's begging the question. He's not answered it.

THE COURT: Wait a minute, Mr. Hargrove. In answer to one of your previous questions, Mr. Sims has said that he was aware of the possibility or he thought that there was a possibility that his participation in the episode might have been inaccurately stated by some of the other defendants.

Did you not say that, Mr. Sims?

THE WITNESS: Yes, sir."

In the written statement, prepared in petitioner's handwriting, he said:

"I decided to plead guilty and to tell all I knew including testifying for the Government for the following reasons:

(1) I chose not to compound my part of the crimes with lies disguised as a defense.

(2) I have heard and know to be a fact that two or more of codefendants have made statements consistant with guilt. I know that some codefendants are unaware of, and ignorant to, different aspects of the operation or crimes, and possibly made some conflicting statements. Since I was the major planner and excepted leader of the group, and I was and still am aware of all of the aspects, I feel that I am the only one that can accurately fill in any open gaps and put everything in its proper perspective once and for all.

(3) Everyone involved was fully aware of the fact that they were conspiring to commit, and participating in, the commission of, a major crime. Everyone involved participated voluntarily on his or her own free will. Everyone involved knew of the existence of certain risk. Everyone involved expected to receive, and in fact did receive a percentage of the proceeds. I feel that everyone involved should shoulder his or her share of the ultimate responsibility.

Having practically completed giving a complete statement to the F. B. I. and the U. S. Attorney I feel releived and happy. (continued)

(2)

Relieved because having revealed the whole truth I feel unburdened.

Happy because prior to my volunteering through my court appointed lawyer Mr. George Russell to give a statement, no one during months of confinement attempted to extract a statement from me. Also, my statement was given in the presence of two U. S. Attorney, one F. B. I. Agent and one U. S. Marshall none of whom made any attempt to put words into my mouth, or sought to make me remember what I did not remember, or sought to make me know what I did not know. I was allowed to recite everything in my own words, from my own memory, I was not offered or promised anything. Having been the recipient of a gross miscarriage of justice at one time in my life solely because I was poor and a Negro I know too well what injustice can do to one. Finally I'm happy for my three and five year old little boys because as long as justice is adminerstered as it has been accorded me during my confinement on the present charges they are insured a pretty bright future.

Signed, Warren Arthur Sims,
At, Baltimore City Jail
On, May 5, 1964"

Both petitioner's testimony and his written statement occurred prior to the imposition of sentences in the Oxon Hill and second Bensonhurst cases and, for this reason, have greater reliability than evidence given after sentence is imposed by a person manifestly dissatisfied with the punishment visited on him. Petitioner was dissatisfied. By his testimony on the instant motion, he was seeking the imposition of concurrent sentences and he had been successful in extracting a commitment from the United States Attorney, made known to the Court at the time of final disposition but not followed by the Court, that the United States Attorney would not oppose concurrent sentences, even though he would not recommend them. Petitioner's testimony in cross examination at the hearing on the instant motion that he refrained from communicating his dissatisfaction with Mr. Russell to the Court because

Mr. Russell was highly regarded among Negro inmates of the Baltimore City Jail, and because there had been recent newspaper publicity praising Mr. Russell is not believable. Petitioner has been before the Court in connection with arraignments, rearraignments, sentencing, the trial of the Smith case, and the hearing on the instant motion numerous times, and has expressed himself freely at court appearances and in correspondence with the Court, not only about his counsel, and reconsideration of his sentence, but also about hearing and trial dates in regard to the instant motion, and the Court concludes, from its many opportunities to hear and observe petitioner, that had he been truly dissatisfied with Mr. Russell he would have not been so reticent nor so deluded by the high opinion of Mr. Russell held by others. Certainly, he would not have expended the positive and unnecessary effort to praise Mr. Russell during his allocution nor attempted to retain Mr. Russell after sentence was imposed. Petitioner cannot escape the inevitable conclusions from his prior position by suggesting now that less was to be expected from Court-appointed counsel. Petitioner was demanding in the qualifications of his attorney and he knew that the Court had afforded him considerable latitude in setting those specifications. The Court, therefore, concludes that asserted deficiencies in Mr. Russell's representation of petitioner played no part in petitioner's conclusion to enter pleas of guilty. Rather, the Court concludes that petitioner concluded to plead guilty because he was aware that his codefendants would attempt to place all guilt on him, so that there was sufficient evidence to prove him guilty and, realizing that he was in jeopardy, petitioner desired that each of his codefendants get his just deserts and that petitioner's role as the leader and planner of the series of three crimes be known and admired.

*Alleged Incompetence of Counsel—Merits of Contention:*

Petitioner urges strongly the invalidity of the search of the apartment of his

sister, Mrs. Neil, and the alleged illegal seizure which was an incident thereto. Petitioner and the government were permitted to prove, at length and in detail, the facts and matters relating to the search and seizure, the principal ground on which Mr. Russell's representation of petitioner is attacked, as well as the whole course of representation of petitioner by Mr. Russell. As to the validity of the search and seizure, petitioner argues that Mrs. Neil did not consent to the search, that any consent on her part was involuntary, that Mrs. Neil had no authority or standing to consent, and that the scope of any consent, if voluntary, did not extend to all of the articles seized.

In regard to the search and seizure, it must be borne in mind that the question of their validity as such is not before the Court in this proceeding. The question before the Court is the adequacy of Mr. Russell's representation. Of course, if the search and seizure were clearly invalid, the obviousness of the legal conclusion would have a bearing on the adequacy of Mr. Russell's representation in investigating and pressing the point.

The standard by which adequacy of representation is to be determined is implicit and explicit in the numerous cases in this Circuit which have considered claims of denial of an effective representation in varying factual situations. Kearney v. Peyton, 360 F.2d 589, 4 Cir. 1966; Tune v. Cunningham, 319 F.2d 823 (4 Cir. 1963); Turner v. State of Maryland, 318 F.2d 852 (4 Cir. 1963); Edgerton v. State of North Carolina, 315 F.2d 676 (4 Cir. 1963); United States v. Hill, 310 F.2d 601 (4 Cir. 1962); and Jones v. Cunningham, 313 F. 2d 347 (4 Cir. 1963) and 297 F.2d 851 (4 Cir. 1962). A question of this character is largely factual; the standard to be applied is succinctly stated in Jones v. Cunningham, supra, 313 F.2d at 353:

"Of course, it is not for a lawyer to fabricate defenses, but he does have an affirmative obligation to make suitable inquiry to determine whether valid ones exist. Such a duty is imposed for the salutary reason that '[p]rior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered.' Von Moltke v. Gillies, 332 U.S. 708, 721, 68 S.Ct. 316, 322, 92 L.Ed. 309 (1948)."

While a lack of effective representation, if proved, is sufficient to invalidate a guilty plea or a determination of guilt upon a not guilty plea which follows, the subsequent conviction is valid if there is clear proof that no prejudice resulted. Turner v. State of Maryland, supra. In an earlier portion of this opinion, it has been shown that no prejudice to petitioner resulted, because petitioner in fact did not rely upon any of the alleged defects of representation in concluding to plead guilty, but it will be shown here why the Court concludes that petitioner did not receive ineffective representation.

The search of Mrs. Neil's apartment in the portion of the multiple dwelling which she occupied, together with her two children and petitioner's mother, occurred during the period July 12–13, 1963. From the evidence, the Court finds that Mrs. Neil permitted the F. B. I. to enter her apartment, which was on the first floor, to search it thoroughly, and to make a detailed and intensive search of the basement which was under her control. The Court also finds that Mrs. Neil consented to the opening of the various receptacles and the seizure of the various articles taken, to which further reference will be made, and that, voluntarily, she permitted the agents of the F. B. I. to remain on her premises for the two-day period. No other conclusion could be reached in the light of the testimony and the facts that Mrs. Neil, an owner of various rental properties, was an intelligent woman, a community political leader, a member of the N.A.A. C.P., and was permitted to leave the apartment at the beginning of the search to take her two children to a church from which they were to leave to go on a camp-

ing trip, and that when Mrs. Neil concluded to terminate the search and the presence of F. B. I. agents in her apartment, she stated her wishes and compliance was forthcoming with reasonable promptness. The remaining legal issues raised as to the search and seizure were Mrs. Neil's legal right to consent to the seizure and, as a corollary, petitioner's standing to contest the seizure.

These issues arose from the fact that petitioner, who maintained a separate residence of his own, had a key to Mrs. Neil's apartment and had continuing authority to enter it and remain in it at will. When the F. B. I. interviewed Mrs. Neil at the F. B. I. office, where she voluntarily joined the investigating agents after she had transported her children prior to the intensive search in question, Mrs. Neil indicated that petitioner had stored some things in her basement. On conflicting evidence, I find that Mrs. Neil, on request, consented to a search by the F. B. I. for these items. When Mrs. Neil and the agents returned to her apartment, whether in the company of Mrs. Neil or alone, the agents went into the basement and found a box. Again on conflicting evidence, I find that Mrs. Neil consented to opening the box and examining its contents. On top of the box were clothes and sneakers, evident to view, and, inside the clothes was a ticket with Goody's name and address; inside the box was an uninitialed attache case containing ammunition and license plates and a brown bag with ammunition and license plates. The license plates were recognized as ones relating to certain decoy vehicles and getaway vehicles used in the several attempts, including the successful one, to rob the Oxon Hill bank. Thereafter, with Mrs. Neil's repeated consent, the search continued and a green suitcase, containing a package of about $18,000.00 in currency was found, and also a bucket containing charred money. Mrs. Neil identified the suitcase as her own, but disclaimed ownership of the money or the burned money.

Based upon these facts, and relying on the decisions in United States v. Rees, 193 F.Supp. 849 (D.Md.1961); Reeves v. Warden, 346 F.2d 915 (4 Cir. 1965); and Rees v. Peyton, 341 F.2d 859 (4 Cir. 1965), petitioner argues that Mrs. Neil lacked authority to consent to a search of the contents of the box, since it was clear that the box was not her property and was identifiable as property of petitioner. But this contention need not be and is not decided, because the question before the Court is not whether the seizure was valid or invalid, particularly since two of the authorities petitioner cites were decided after petitioner's case had been finally disposed of. The question before the Court is the adequacy of petitioner's representation and the facts must be looked at through the eyes of petitioner and Mr. Russell in the light of the cases decided at the time at which they were required to act.

The evidence on the instant motion establishes that Mr. Russell was fully aware that Mrs. Neil's apartment had been searched and, in due course, before the pleas of guilty were tendered, Mr. Russell inspected the fruits of the seizure made in connection with the search. Petitioner and Mr. Russell both considered, orally and by correspondence, the legality of the search and seizure. Mr. Russell interviewed Mrs. Neil on an occasion of her visit to petitioner at the Baltimore City Jail. She told him that she had consented to the search; she also told him that petitioner had no control over the premises which were searched. Mr. Russell discussed this information with petitioner. According to Mr. Russell, he explained to petitioner the problem of whether petitioner had standing to file a motion to suppress, in view of Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the doctrine of which would require extension to render it applicable to petitioner's case. Mr. Russell was acutely aware of the danger of petitioner's asserting ownership in the seized articles in order to gain standing, since he had been counsel in United States v. Taylor, 326 F.2d 277 (4 Cir.

1964), where the assertions by defendants in motions to suppress were held to justify a finding against them in a prosecution for a gambling violation under the Internal Revenue Code. This decision was made on January 10, 1964, in the midst of Russell's preparation of Sims' defense.

According to Mr. Russell, whose testimony in this regard is believed, petitioner suggested that perhaps he could allege that the clothing on the premises was his, but Mr. Russell was suspicious of petitioner's veracity in suggesting such an allegation. Overall, Mr. Russell testified that he came to the conclusion that petitioner should not file a pretrial motion to suppress, but, rather, lodge an objection at trial to use of the evidence seized, because he concluded that petitioner had no basis on which to sustain such a motion and, if the motion were filed, the prosecution would not use the seized evidence, but rather rely on other overwhelming evidence of petitioner's guilt, so that petitioner would lose the advantage of surprise at the trial when he challenged the seized evidence. Mr. Russell's only concern was with possible annoyance of the Court at this trial tactic, since the Court favors pretrial disposition of evidentiary issues when cases are tried by a jury, but Mr. Russell was prepared to assume this risk because he knew that it had never been ruled in this District that a defendant lost his right to object to illegally obtained evidence at trial, even though he had not moved to suppress it in advance of trial.

Petitioner testified that he was not aware of Mr. Russell's proposed trial tactics in regard to the allegedly illegally obtained evidence, although Mr. Russell did testify that he explained this tactic to petitioner but was careful not to disclose it to the prosecution or counsel for the co-defendants. The Court believes that Mr. Russell did explain his strategy to petitioner, and the Court is satisfied that Mr. Russell afforded effective representation in this regard. United States v. Rees, supra, was not determinative of the illegality of the seized evidence. The

matter of standing under Jones v. United States, supra, was a debatable one, and an assertion of ownership in the light of the decision in United States v. Taylor, supra, was an extremely dangerous one. Mr. Russell could properly have concluded that petitioner had little to gain by a pretrial motion to suppress, and much to lose. While there was some risk in saving the objection until trial, this Court cannot say that Mr. Russell demonstrated incompetency in making the tactical decision that he was required to make, nor does the Court find incompetency established by Mr. Russell's failure to investigate further into the circumstances of the seizure. His interview with Mrs. Neil was short, because, as he expressed it, only the two of them were present at the interview, he knew that she would be a government witness, and it was not his practice to interview a government witness without the presence of a third person. It is undisputed, however, that she told him that she consented to the search and seizure and that her brother had no control over the premises where they occurred. When petitioner was interrogated in this area, Mr. Russell received an intimation that petitioner would perjure himself in order to supply the necessary legal basis for a challenge by Mr. Russell of the search, itself evidence of the correctness of the information he had obtained from Mrs. Neil. There was thus no occasion for him to conduct further inquiry. On this point, this case is quite unlike Jones v. Cunningham, supra, and Bowler v. Warden, 236 F.Supp. 400 (D.Md.1964).

■ The other aspects of Mr. Russell's representation of petitioner are the subject of sharp conflict between the testimony of the two participants. The areas of dispute have to do with the duration and subject matter of the interviews. The number of interviews are fairly ascertainable since petitioner was in custody and reasonably reliable records of Mr. Russell's visits to petitioner were kept. The interviews were numerous, and there was considerable correspondence from petitioner to Mr. Russell,

mostly of a carping, demanding nature that suggest that Mr. Sims was dissatisfied with the quantum rather than the quality of Mr. Russell's representation. That these are self-serving statements entitled to little weight, and that petitioner in this regard is not a credible witness, seems clear from petitioner's pre-sentencing and postsentencing expressions of satisfaction with the way in which he was represented by Mr. Russell.

It would only prolong an unduly lengthy opinion to recite in detail the many conflicts in the testimony of petitioner and Mr. Russell. It suffices to say that, by the weight of credible evidence, the Court is satisfied that Mr. Russell consulted with his client at least seventeen different times prior to the entry of the plea of guilty to count 4 of the Oxon Hill indictment; he interviewed Mrs. Neil; prior to his first consultation with petitioner, he consulted with the United States Attorney and obtained discovery of certain data without the necessity of filing pretrial motions; he conducted research into the legal problems relating to search and seizure and the sufficiency of evidence to obtain a conviction of conspiracy under federal practice; he registered an objection to the amount of bail fixed for petitioner, but did not pursue the matter of bail after he ascertained that petitioner could not furnish reasonable bail; he prepared and presented pretrial motions on behalf of petitioner with some degree of success as to discovery; he obtained copies of arrest warrants and affidavits setting forth probable cause in support thereof, discussed them with petitioner and obtained information from petitioner "filling in the gaps," to the end that Mr Russell himself was satisfied that petitioner was guilty as charged; he consulted with counsel for petitioner's codefendants and apprised himself of the position they would take in the prosecution; he reviewed and counseled against petitioner's affidavit attributing bias and prejudice to the Court, and seeking a disqualification of the judge to whom the case was assigned; he pressed for, and obtained, a transfer of the second Bensonhurst case to the District of Maryland, so that he could thereafter press for concurrent sentences in an effort, although unsuccessful, to reduce petitioner's aggregate commitment; he obtained from the prosecutor an agreement not to oppose the imposition of concurrent sentences; he presented quite competently all of the mitigating factors petitioner could claim at the time of sentencing; and he pressed a postsentence motion for reduction of sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure. This statement is by no means exhaustive in detailing the services Mr. Russell afforded petitioner, but it serves adequately to show that Mr. Russell did far more, and with greater effectiveness, than any counsel who has ever been branded as incompetent in any proceeding of which this Court is aware. Neither in regard to the matter of the search of Mrs. Neil's apartment and the seizure of evidence therefrom, nor generally in representing Mr. Sims, was Mr. Russell incompetent.

*Effect of the Alleged Illegal Search and Seizure:*

 Even if the close question of law on the search and seizure question were resolved, as petitioner contends, by a finding of illegality, it would not entitle petitioner to the relief he requests. He knew that there was a question about the validity of the search and seizure. Petitioner and Mr. Russell discussed the search and seizure and the law involved. They even exchanged memoranda. It may be that Mr. Russell was pessimistic about petitioner's chances successfully to prosecute a motion to suppress, but this Court will not speculate on the mathematical accuracy of this estimate beyond noting that petitioner was aware of the possibility and chose not to pursue it by entering the voluntary guilty plea. Legally the Court can conclude only that petitioner waived any preconviction defect in the search of Mrs. Neil's apartment and the seizure of evidence incriminating petitioner.

Beyond the fact that petitioner waived the issue of the effect of an alleged illegal search and seizure on his guilty plea, his knowledge of the seized items was not a basis for his decision to plead guilty. As has been demonstrated in the discussion under the heading "Counsel's Alleged Inattention and Failure to Press Motion to Suppress—Influence on Petitioner," Mr. Sims concluded to plead guilty for totally different affirmative reasons and never asserted or mentioned the seized evidence·as a factor leading to his conclusion. Since the evidence seized in no way influenced Mr. Sims' plea, the plea could not be considered the fruit of any violation of Mr. Sims' constitutional rights which might be found to arise from the search and seizure and, therefore, to be involuntary.

*Petitioner's Claims for Relief:*

Petitioner has proceeded, both under 28 U.S.C.A. § 2255 and Rule 32(d). From the foregoing, the Court concludes that petitioner has shown no right to relief under § 2255. Rule 32(d) is, however, broader than § 2255, because it permits a Court to conclude that manifest injustice was visited on a defendant, even though his guilty plea was voluntary and he was afforded procedural and substantive due process. Pilkington v. United States, supra, 315 F.2d at 209–210.

Petitioner here makes no claim of innocence. Unlike the Second and District of Columbia Circuits, Smith v. United States, supra; United States v. Paglia, 190 F.2d 445 (2 Cir. 1951); and United States v. Norstrand Corp., 168 F.2d 481 (2 Cir. 1948), this Circuit has not yet required an allegation of innocence as a prerequisite to a defendant's claiming relief under Rule 32(d). This Court does not now impose one, but, in exercising the discretion vested in it by Rule 32(d), this Court cannot be unaware that, knowing all of the factors which he now claims entitle him to relief, except misadvice as to the penalty for conspiracy which this Court concludes provides no basis for relief, petitioner freely and voluntarily testified in the trial of his codefendant Smith and

exhaustively admitted his guilt. To permit petitioner, under such circumstances, to withdraw his plea of guilty would convert justice into a game and permit petitioner, none of whose rights were violated, to toy with the time, energy and sanctity of the judicial process. The Court declines to exercise its discretion to grant petitioner relief under Rule 32(d).

What has been said is not to reflect upon petitioner's Court-appointed counsel. They accepted a perhaps unwelcome assignment and have pursued it with vigor, zeal and outstanding advocacy. To them, the Court expresses its appreciation and thanks.

The Clerk will enter an order denying petitioner's motion.