Eddie WHITE, Sr., Appellant,

v.

Vernon L. PEPERSACK, Warden, Maryland Penitentiary, The Hon. Thomas B. Finan, Attorney General of the State of Maryland, Appellees.

No. 9971.

United States Court of Appeals Fourth Circuit.

Argued Oct. 6, 1965.

Decided Nov. 1, 1965.

Henry R. Lord, Baltimore, Md. (Court-assigned counsel) for appellant.

Loring E. Hawes, Asst. Atty. Gen., of Maryland (Thomas B. Finan, Atty. Gen., of Maryland, on the brief) for appellee.

Before HAYNSWORTH, Chief Judge, BRYAN, Circuit Judge, and BUTZNER, District Judge.

HAYNSWORTH, Chief Judge.

The question is whether the defendant, after having been convicted of murder, is foreclosed by his trial admission of the homicide from attacking collaterally the prosecutor's use of (1) evidence seized in an unlawful search, (2) a confession claimed to have been involuntary, and (3) testimony claimed to have been perjured.[1] We hold that he is not.

At about three o'clock one morning, after a long night of drinking, of real or imagined slights at the hands of his paramour and her mother and of bickering with a roomer, the defendant slew a comparative stranger and wounded in the leg another man whom he regarded as his friend. This occurred in the house of the paramour, immediately across the street from his own,[2] where several men, including the defendant's male roomer and the two victims had been laughing and talking with the paramour's mother.

The defendant returned to his own house, where, until then, he had spent the major part of that night and where the baby was sleeping. He left his shotgun there and immediately departed in search of a taxicab. As he left his house his friend, who had been shot in the leg and who had made his way to the street, called to him, declaring he had been shot and asking assistance in getting to a hospital. The defendant responded that he was sorry he had shot his friend, but he had to get someone to stay with the baby.[3] He raced away to another street, hailed a taxicab and directed the driver to the home of his mother-in-law.

En route, however, the defendant instructed the driver to stop at the site of a public telephone. There the defendant placed a call to the police and informed the answerer that he was the one who had done the shooting at the Madison Avenue, Baltimore, address and that they need not come in search of him, for he would return to the scene as soon as he got someone to stay with his baby. In the taxi, he then proceeded to the house of his mother-in-law, aroused her and told her of his need. With her, he then returned to the scene in a taxi.

Meanwhile, policemen had entered his house and seized the shotgun. Upon his arrival, he was arrested and confronted with the shotgun. He readily acknowledged its ownership.

Carried to the police station and asked if he would give a statement, he responded:

"Yes I will if I can call my boss, and have him come and read it to me. I will tell you the story, but I will not sign it until I see my attorney."

He was then told:

"Eddie you know that anything you say must be free and voluntary on your part with no threats or promises of any kind, and that anything

---

1. There was also a claim of incompetency of counsel founded principally upon the absence of timely steps designed to effect a rejection of the evidence to which objection is now made.

2. The defendant, his infant daughter, his paramour and her mother appeared to have used the two houses indiscriminately.

3. He had been paying his paramour's mother to care for the baby. He was supporting, or contributing to the support of seven other children in foster homes. Three of them were his. The other four had been borne by his then deceased wife before she met him.

you say can and will be used against you in court."

He then told the policemen his version of the events of the night, but declined to sign a written transcription of the interrogation because of the absence of the lawyer, the "boss" [4] whose assistance he sought in his preliminary statement.

■ We may interpolate here, that the constitutional claims are not insubstantial. Indeed, thus far, the State has suggested no justification for the search of defendant's house except an assertion that it was an incident of the subsequent lawful arrest of the defendant as he alighted from the taxi in the street. To prevail, the assertion must surmount obvious difficulties both of time and space.[5]

At the trial, the gun was introduced in evidence, as were photographs of it. Some of the witnesses testified and the unsigned transcript of the defendant's interrogation was read to the jury.

After the State's case was in, the defendant took the stand. He stated that his right not to testify had been explained to him, but he wished to testify. He then told his story. He admitted the homicide, as he had from the outset, but he testified that he was out of his mind until his friend called to him for help after the shooting. He then realized what he had done. He offered no explanation for his conduct except intoxication and anger against his unharmed roomer. He claimed he had no recollection of what prompted him to shoot the two victims.

Under these circumstances, for a number of reasons, we think unfounded the District Court's conclusion that White's "judicial confession" foreclosed a collateral attack based upon earlier defects, as a voluntary guilty plea might have done.

■ It is a familiar principle that a voluntary plea of guilty does foreclose subsequent collateral attack upon the judgment and the sentence when the attack is based upon an alleged deprivation at some earlier stage of the proceedings.[6] The guilty plea is acceptable however, only after a searching inquiry to assure that its tender is voluntary. Even so, the plea is not a bar to a subsequent collateral attack if it is found in those proceedings that, because of the alleged deprivation, the plea was involuntary. The rule is applied in recognition of the fact that a defendant, aware that a confession may be excludable as involuntary, may still enter a truly voluntary plea of guilty if he also knows that other admissible evidence will establish his guilt overwhelmingly. If it appears, however, that the plea was the coerced product of a tainted confession, the involuntary plea, entered in ignorance of his rights, does not bar the collateral attack.[7]

In contrast, there was no such inquiry here. The defendant, responsively, said he had been told of his right not to testify, but, of course, there was no probing behind his statement of his wish to do so. More particularly, there was no warning, and no reason for him to foresee, that what he had to say might be treated as a plea of guilty to the offense as charged in the indictment.

■ Treatment of his testimony as a plea of guilty to first degree murder as charged, subverts the defendant's obvious intention. Clearly, he did not knowingly confess guilt of the charge of murder in

---

4. The proprietor of the laundry in which the defendant worked was also a lawyer.

5. The defendant was tried six days before the decision of the Supreme Court in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. This fact may help to explain the conduct of the police and the lawyer's failure to object to receipt in evidence of the gun. The point is not foreclosed by Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601, for the time within which White might have taken a direct appeal from his conviction had not expired when Mapp was decided.

6. See, for instance, Watts v. United States, 107 U.S.App.D.C. 367, 278 F.2d 247; Sullivan v. United States, 10 Cir., 315 F. 2d 304.

7. See, Watts v. United States, 107 U.S. App.D.C. 367, 278 F.2d 247.

the first degree. He did not withdraw his plea of not guilty. He took the stand to controvert the inference of premeditation which the State's case, viewed alone, would have supported. Obviously, his only hope was a conviction of a lesser offense, and his testimony furnished a basis for it.[8] If his testimony is viewed as a binding admission, the inferences should be in his favor, not against him. The defendant in a murder trial, who voluntarily takes the stand and there testifies that his was the hand that took the life but justifies his conduct as self-defense or mitigates it or controverts any of the essential elements of murder in the first degree, cannot be said to have voluntarily and knowingly confessed in open court the maximum charge he is contesting. Indeed, had Judge Carter found this defendant guilty of second degree murder, rather than first degree murder, and imposed an appropriate sentence, even the defendant, who, from the outset, admitted the homicide and never tendered justification of it, might have accepted his punishment as appropriate. Extended judicial inquiry, with all of its expense and delay, is the natural product of overconstruction of a defendant's admissions and the imposition of an inappropriate sentence. The flood of postconviction cases in state and federal courts will be stemmed only if justice is made to shine more brightly in the trial courts.

We do not move in new ground, however. The Supreme Court has settled the issue. In Fahy v. State of Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171, it dealt with the same problem in somewhat different garb. There it was contended that the receipt of the evidence illegally seized and of the post-arrest admissions was not prejudicial in light of the defendant's trial testimony in which he admitted the essentials of the offense, but offered some attempt at mitigation of it. The Supreme Court reversed the conviction. It held that admission of the illegally seized evidence in the state's case in chief was a prejudicial denial of the constitutional rights of the defendant, notwithstanding his later testimonial admission of the essential elements of the crime, moderated only by an offer of some facts in mitigation.

The Supreme Court's holding that receipt of the evidence in violation of the defendant's constitutional rights is prejudicial, notwithstanding his testimonial admissions and its reversal of the conviction, requires our rejection of the contention that the testimonial admission, broadly construed, forecloses the defendant's right to assert the prejudice of the State's evidence.

We conclude that the defendant's testimony was not a voluntary plea of guilty and that he is free to attack, as prejudicial, the evidence introduced by the State as a claimed violation of his constitutional rights.

Denial of the writ without a hearing is reversed and the case remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

---

8. In Maryland, proof of an unlawful homicide creates a presumption of malice, so that it will support a conviction of murder in the second degree as well as of manslaughter. DeVaughn v. State, 232 Md. 447, 194 A.2d 109, 100 A.L.R.2d 761 (1963). If the defendant's testimony was insufficient to overcome that presumption, however, it was clearly enough, if believed, to avoid a conviction of murder in the first degree. To convict one of that offense, the presumption of malice is not enough. The State must, in this context, prove premeditation. DeVaughn v. State, 232 Md. 447, 194 A.2d 109, 100 A.L.R. 2d 761 (1963). While voluntary intoxication is no excuse, it is highly relevant to the classification of the offense as first or second degree murder. If the proof admits different inferences as to the degree of intoxication, it is a question for the jury, Chisley v. State, 202 Md. 87, 95 A.2d 577 (1953), but if the intoxication is so great as to foreclose an inference of premeditation, the offense is second degree murder at the most.