**Eddie WHITE, Sr., Petitioner,**

v.

**Franklin W. BROUGH, Warden, Maryland Penitentiary, Respondent.**

**Civ. A. No. 14617.**

United States District Court,
D. Maryland.

July 27, 1971.

Henry R. Lord and Russell Reno, Jr., Venable, Baetjer & Howard, Baltimore, Md., for petitioner.

Loring E. Hawes and Alfred J. O'Ferrall, III, Baltimore, Md., Francis B. Burch, Atty. Gen. of Maryland, for respondent.

## MEMORANDUM OPINION
## AND ORDER

WATKINS, District Judge.

The petitioner, Eddie White, Sr., was tried and convicted of first degree murder in a one-day trial on June 13, 1961, before Judge Joseph L. Carter, sitting without a jury in the Criminal Court of Baltimore City. He was sentenced to life imprisonment in the Maryland Penitentiary. No motion for a new trial was entered and no appeal was taken from this conviction and sentence. Petitioner's first state petition under the Uniform Post Conviction Procedure Act was filed July 26, 1961 and was disposed of on procedural grounds on May 2, 1962 by then Chief Judge Emory H. Niles of the Supreme Bench of Baltimore City. While counsel was appointed for petitioner, he was not permitted a hearing on his petition. Application for leave to appeal was denied by the Court of Appeals of Maryland in White v. Warden, 229 Md. 645, 184 A.2d 840 (1962). Petitioner then filed application for Writ of Habeas Corpus in the United States District Court for the District of Maryland. This petition was denied on May 27, 1963 by this Court on the ground that his state remedies had not been exhausted, in that he had not presented the issue of illegal search and seizure to the state court in a collateral proceeding. On June 19, 1963 petitioner presented the search and seizure question

in his second petition under the Uniform Post Conviction Procedure Act. This issue was decided summarily on procedural grounds against the petitioner by Judge Meyer M. Cardin of the Supreme Bench of Baltimore City on November 13, 1963. Application for leave to appeal was denied by the Court of Appeals of Maryland in White v. Warden, 234 Md. 615, 197 A.2d 909 (1964).

Having thus exhausted his state remedies, petitioner filed a second petition for Writ of Habeas Corpus in the United States District Court for the District of Maryland. He set forth the following grounds of complaint:

"# 1—Denied the right to competent counsel, etc.

"# 2—Perjured testimony committed by the several states witnesses, etc.

"# 3—Incompetent counsel.

"# 4—Unlawful search of petitioner's and unlawful use by the prosecution of the shotgun which was the fruits of [sic] the said lawful search SUPRA.

"#5—Unlawful obtention of the confession unlawful [sic] placed in evidence by the prosecution

\* \* \* \* \* \*

"#6—That he was arrested without a warrant."

Petitioner was not afforded a hearing on the merits of these contentions as this court ruled that petitioner's confession in open court precluded habeas corpus relief, and was the source of his conviction, rather than any evidence, even if illegal, introduced at that trial.

This ruling was reversed on November 1, 1965 by the U. S. Court of Appeals for the Fourth Circuit. White v.

Pepersack, 352 F.2d 470 (4th Cir. 1965). A hearing was held on January 5 and 6, 1966.

It was agreed that the hearing should be limited to the points:

1. Illegal arrest of petitioner, and seizure of shot gun from 1213 E. Madison Street.

2. Voluntary nature of the confession at the Eastern Police Station at 8:30 a. m. on October 8, 1960.

3. Illegal arrest.

It was further agreed that if petitioner were unsuccessful on all three points, a further hearing would be had on the following:

4. Knowing use by the State of perjured testimony.

5. Incompetency of counsel.[1]

On June 3, 1966 argument was heard on the first three points, and substantial time was allowed for briefing, which was delayed by counsel on each side changing employment. The court did not feel satisfied to decide the case in petitioner's favor on the first three points. Moreover, as the result of several conferences between the court and counsel, it appeared that the "incompetency" of trial counsel had assumed an aspect different from what either the court or counsel had initially envisioned. A further hearing was had on November 14, 1969, and substantial time was allowed, and taken, for briefing.[2]

## STATEMENT OF FACTS[3]

*Testimony of Sergeant William Hirsch*

Sgt. Hirsch, of the Eastern District Police Station, testified that he arrived "between 4:00 and 4:05 A.M." at 1216 East Madison Street on October 8, 1960 to investigate a shooting. He first went

---

1. Since petitioner's trial counsel testified at length at the hearing, approximately eighty percent of the question of competency, as originally conceived, was covered in this hearing.

2. Certain personal problems of family health, as well as a heavy courtroom schedule, required the court to work on this opinion, at unfortunately long intervals, at home at night.

3. The statement of facts is largely based on petitioner's brief, which respondent accepted as "substantially correct." Where, however, there is a conflict in the testimony, the Court, when it differs from petitioner's version, has substituted its finding.

into the "middle room first floor" where he found a male "apparently dead". He could not recall which witnesses he spoke with but suggests that "possibly" he spoke with Miss Williams, Mary Louise Whitby and Dorothy Gray. He did not recall speaking with Leon Camphor or William Smith (also known as Buckwheat). He did recall that Buckwheat was shot in the leg and was removed by ambulance some time later to Johns Hopkins Hospital. One of the reasons cited for not questioning Buckwheat was that he "had numerous other witnesses who witnessed the actual shooting itself, so I wouldn't be too concerned about questioning Buckwheat at that time". He said that he probably spoke to two or three witnesses. From them he elicited the information that Eddie White, who lived at 1213 East Madison Street, had entered 1216 East Madison Street, had shot Peter Rabbit (later found to be James Perry Noble) with a shotgun and had returned across the street to 1213 East Madison Street where he entered the house with the shotgun, and was not seen to have left (H.C. 28).[4] Dorothy Gray was a previous informant and was well known to Hirsch. He did not know White personally or by reputation. He testified that the viewing of the body and the interviewing of witnesses took "two or three minutes." Hirsch did not attempt to find out what kind of an interest White had in the premises at 1213 and did not recall, although he knew at the time, that Dorothy Gray lived at 1213. Three officers, or more, in addition to Hirsch, went to the front door of 1213 and covered for each other. Hirsch attempted to gain voluntary entrance by knocking and there was no response. After kicking open the front door he and another officer entered, covered by the pistols of their two companions, who then entered covered by Hirsch and the first entrant. A room-by-room search was conducted. Hirsch did not recall breaking two bedrooms on the second floor but stated that quite possibly this was done in the course of the search which was directed only to places in which a person could hide. No search was made in drawers or other small places. In the course of the search the officers looked behind a door in the middle room of the first floor where a person might hide. They found no men, but did discover a shotgun. This shotgun was taken from the premises by Hirsch because "it was evident to me that it was the weapon that was used in the homicide and I figured it was my duty to seize it as evidence." The search took between five and ten minutes.

Upon returning to 1216, Hirsch stated that "I believe I placed it on the chair" (referring to the shotgun). The chair on which the shotgun resided was immediately to the left of the front door upon entrance to 1216.

After Hirsch had returned to 1216, a call was received from the radio dispatcher saying that a colored male had telephoned in that he had just shot a man at 1216 E. Madison Street, and was returning to the scene to give himself up. "A short period of time" after the call was received, White returned. Hirsch could not estimate how long after the call was received White returned. Hirsch's report indicated, however, that it was at "approximately 4:30". White returned by taxi cab which stopped "somewhere convenient to 1216" but Hirsch did not recall actually seeing the cab, as he was inside and did not actually participate in the arrest. While he did recall the taking of the picture showing White and the shotgun, he did not remember whether he asked White to point to the shotgun. According to Hirsch, White, on the scene, admitted shooting Noble and Buckwheat, that the shotgun was his, and that it was the one he had used. His statement at the scene was substantially similar to the typed statement (H.C. 221). Hirsch did not recall the sequence in which these statements were made but testified that

4. "H.C." refers to the transcript of the habeas corpus testimony: "Tr." to the transcript of the original trial, which was made a part of the habeas corpus record.

White said he had shot Peter Rabbit and Buckwheat before Hirsch pointed to the gun (H.C. 53). An additional fact, recalled when he took the stand a second time, was that White was shown the dead body of Noble and identified it. White was on the premises "just long enough for us to get a cruising patrol there for transportation".

Hirsch stated that later that morning he took a detailed statement from White, which was reduced to writing. He recalled that White agreed to give the statement but could not sign it unless his request to call his boss "and have him come down and read it to me" was granted; "I will tell you the story, but I will not sign it until I see my attorney" (H.C. 51). Hirsch recalls no requests for phone calls and stated that if such requests had been made to him, he would have honored them.

### The Testimony of Harry A. Raker

Harry A. Raker testified that White had been working for him on a regular basis for four or five years, at the time of the incident, as a presser at his cleaning establishment (Charles Cleaners). He also testified that he was a member of the bar and had been a part-time practicing lawyer since 1953 but "not criminal work" (H.C. 63). He recalled that he had represented White in a domestic matter in Northwestern Police Station and that he was considered by White to be his lawyer as well as his boss. He received no phone call from White on the morning the statement was taken and in fact never received a call from White in this matter.

### The Testimony of Theodore B. Gaylor

Mr. Gaylor, a taxi cab driver for Belle Isle, stated that White was standing between Aisquith and Monument Streets on Gay Street hailing a cab at approximately 4:00 A.M. on October 8, 1960. After picking White up and after about 10 minutes had elapsed, he stopped to let White make a telephone call at a public phone booth located at Druid Hill Avenue and Dolphin Street. White told Gaylor that he was calling the police to say he was not running (H.C. 73). He told Gaylor he "had killed one man and shot another by mistake" (H.C. 73). Two or three minutes after completing the call White asked to be taken to his mother-in-law's house on Division Street. He was inside his mother-in-law's house approximately 10 minutes. They then returned to 1216 East Madison Street. The cab was stopped in front of 1214 in the curb lane. He testified that "first after he started talking about what happened, I thought maybe he was drinking or maybe doped up." He testified that the running rate was $3.00 an hour, that the meter had recorded $1.10, and that the meter was "non-recording" when White was in his mother-in-law's house. Upon cross-examination, Gaylor amended his estimate of the return time to 8 to 10 minutes.

### The Testimony of John Hodge

Mr. Hodge is White's cousin who shared a house with him at 1213 East Madison Street. He testified that he returned to his house at 8:00 A.M. on October 8, 1960. He found "the door was wide open; the lock was broken on it" and that "the back door was open, you can see right through, you can walk right through." He did not recall any indication that the back door had been broken (H.C. 83). The lights were on all over the house. He testified that his bedroom was next to Eddie White's on the second floor of the house and that both bedrooms had padlocks and latches on the outside. He stated that his door had been locked when he left the house before midnight the night before. The hinge on Hodge's door was broken, "pulled out from the wood", the door was open and the lights were on. White's door was also open. He testified that he and White divided the rent of $15.00 a week. He stated that except that the bed had been pulled out from the wall and that the closet door had been opened, nothing was disturbed (H.C. 94).

### The Testimony of Eddie White, Sr.

Mr. White stated that the first time he realized that there had been a shooting

was when Buckwheat told him that he had been shot. At that point Buckwheat was standing in Forrest Street which is a small alley located to the north behind 1216 East Madison Street. He then went back in 1216 to assure himself of his daughter's safety on the second floor, then went across the street to his home at 1213. He came out the front door of 1213 and again saw Buckwheat who was standing in front of 1209 or 1211 East Madison Street on the south curb and who again spoke to White. Buckwheat requested assistance but White told him that he could not help. He then went down the alley to where he hailed a taxi cab at Gay and Aisquith Streets. He testified that he made a phone call to the police which took about five minutes and that he then went to his mother-in-law's house and waited while his mother-in-law and sister-in-law got out of their bed clothes and into street clothes. All three returned to the scene in the taxi cab. White confirmed the location of the cab as testified to by Gaylor.

After a scuffle with the police while attempting to pay Gaylor the fare, he was taken immediately into 1216. The first thing brought to his attention was the shotgun "laying on the chair right by the door". He was told that the shotgun had been taken from behind a door in his house and he said that it appeared to be his gun. The police asked White to point to the gun which he refused to do. He recalls that a photograph was taken, nonetheless. He estimates that he was in 1216 about five minutes.

He was then taken to Eastern Police Station. Some time after being placed in the cell and sleeping he was taken by the turnkey and another policeman in uniform to the interrogation room. The policeman and White sat down in the room and White accepted a cigarette but refused some coffee. About five or ten minutes later, three or four more officers came into the room, some in uniform and some not. There was not a typist in the room at that point. The first question asked was whether the shotgun belonged to White. One of the policemen had brought the shotgun into the room. He responded again that it was his shotgun. He was asked what he was doing with the shotgun and responded that he and his cousin planned to go hunting. The police said "you got yourself a rabbit this morning, didn't you?" The general tone of the questioning was in a "joking manner". The police told him that they had witnesses who could identify White and that they also had statements from these witnesses. He was never told who the witnesses were and he was never shown the statements and was never confronted by any of the witnesses. The only evidence he actually was aware of was the shotgun. Upon being told that they wanted to take a statement from him, White responded that he would give a statement "but refused to sign the statement until I talked to my attorney or either see my boss" (H.C. 118). The typist then came into the room along with one or two more policemen. White refused to sign the statement until he talked with his attorney or his boss. He did not believe that it could be used against him unless it was signed and was never told that it could be used by the police. Later that day he was taken to the Captain's or Lieutenant's office, confronted with the statement again, and again refused to sign it "until I seen my boss or my lawyer" (H.C. 119).

More generally, White testified that he always kept his room locked and he also recalled that he left it locked on the morning of October 8, 1960. No one else had a key besides White. The only way for anyone else to have entered was to break in. White testified that, prior to going to the police station, that he never mentioned killing someone but he might have told the police operator and the cab driver that he shot someone. He did not know until he reached the station house "to be frank with you, sir" that Noble was dead. Furthermore, he was not aware that the body was on the scene when he was in custody; but he did not really know whether it was, or not (H.C. 137).

White testified that "the last thing I remember was looking in that window and seeing this fellow Leon demonstrating how he had a knife around my throat" (H.C. 127).

On cross-examination White stated that in the trial court he "admitted that he made the statement, that it was voluntary and that" he "had no objection to it" (H.C. 123).

White testified that he took the stand because the shotgun and the confession and the lies in the State's case "compelled" him to testify. White had been worried about his confession but was assured by his trial counsel that there was nothing to worry about. He stated that his lawyer, Pairo, told him to take the stand so as to encourage his mother-in-law to testify.

His exact words were:

"A. I don't think we had a discussion, was I to take the stand or not, during the course of coming to visit me, but I do know when the time came for me to take the stand, he said he wanted me to take the stand and testify to encourage my mother-in-law" (H.C. 127).

\* \* \* \* \* \*

"Well my lawyer, when the time came to call me to the stand, he told me he wanted me to testify to encourage my mother-in-law to better testify whatever it were."

"Q. Is that the only reason you took the stand?

"A. What other reason would there be?

\* \* \* \* \* \*

"That is the only reason I took the stand, sir.

"Q. Didn't you know when you took the stand that anything you said would have been used against you in convicting you?

"A. When you take a man who's illiterate and ignorant and in jail and fighting for his life and and liberty and a whole lot of

damage evidence is piled up against him he has to take all kinds of chances, whether it hurt him or save him" (H.C. 128).

Neither his lawyer nor the court explained the meaning of the word "voluntary" to him; but his lawyer did not tell him to say that the confession was "voluntary".

In connection with his return to the scene, and the question of giving himself up, petitioner stated that he was "trying to explain voluntary and not voluntary \* \* \* I voluntary came back to the scene, but turn myself in to the police, I say no, because they didn't give me a chance to get out of the taxicab" (H.C. 133).

He had no legal experience or background at that point and the confession indicates only a fourth-grade education. He did not take an appeal because "I did not know how to do it, what terms to go into". Furthermore, he also claimed that he was never advised of his right to appeal, or of his right to a new trial by his trial counsel. White stated that he had never heard of a "belated appeal" and that the only remedy he could think of was to write Judge Carter, which he did.

*The Testimony of Officer John J. Bryl*

Officer Bryl, the radio dispatcher for the Police Department, received a call at 3:58 A.M. on October 8, 1960 stating that there had been a shooting at 1216 East Madison Street. A second call was received at 4:15 from a colored male who stated that he had done the shooting at 1216 East Madison Street and was returning by cab to give himself up at the scene. His report was made up between 5:30 and 6:00 on the morning of October 8, 1960. He testified that there is estimated to have been no more than a minute's delay at the most between receiving a call and sending it out. Both calls were forwarded out to Car 30.

*The Testimony of Preston A. Pairo, Jr.*

Mr. Pairo testified that he was appointed to represent White on December 16, 1960 by The Honorable J. Gilbert

Prendergast of the Supreme Bench of Baltimore City. He had been an investigator in criminal cases, for a law firm and the State of Maryland. As an Assistant State's Attorney for Baltimore City, 1954–1959, he participated in over 2000 trials, including over 70 homicide cases, and had defended 20–30 such cases (H.C. 161). After reviewing all the physical and verbal evidence in the State's Attorney's file, he went over this evidence at some length with petitioner and fully covered petitioner's background and version of the offense. He advised petitioner fully as to trial procedure, and went over the State's evidence with him. Pairo was concerned because of petitioner's "lack of remorse and contrition in this matter. * * *" He advised petitioner that he was in "extreme jeopardy". He felt that the State would seek and secure a conviction of first degree murder despite the fact that Pairo believed White was "harassed and embarrassed" by an argument and motivated by anger.

Pairo testified:

"The defense, not in particular details that was related to me was that this was a concrete jungle situation, and this was justified, and I had to advise Mr. White that we do not operate under the laws of the concrete jungle, that we operate under the laws of the United States Government and the State of Maryland and the same rules and regulations do not apply.

"He felt some justification due to the circumstances of the relationship of the parties, as to who was living with who and just what their relationship was between each other seemed to justify this occurrence. I felt that I had convinced him that while this might be true in the concrete jungle, this is not true in our society and this is what concerned me" (H.C. 169).

Pairo further testified that at the conclusion of the State's case:

"He insisted at that time that he take the stand, he wanted the Judge to hear his version. I told him that I did not approve of it, but if it was his decision and he soon advised the Court that it was, that is what I wanted him to do, if that was his decision, but I advised him not to take the stand.

"If the Court wants my reasons, I would be happy to give them, but I think they are apparent.

"I advised him generally that the State had a burden of raising the homicide from second to first, and that I felt that this raising from second degree to first degree had been accomplished by the State, and it was our duty to reduce it, and we had no witnesses except him, and that I did not think that his statement or, I am sorry, his testimony at that time, could reduce it because it would be subject to cross examination.

"At that time, he said he wanted to say certain things that his mother-in-law might want to hear, and I told him I saw no reason for this; it was more in the nature of an overture, to let his mother-in-law know that he felt strongly for these children, and that he was a good man, having nothing to do with the facts of the case. It was at that time over my objection he voluntarily testified on his own behalf" (H.C. 172–173).

In response to the question as to whether he thought the verdict might be reduced to second degree murder if petitioner took the stand, Pairo testified:

"I would like to answer that with two answers both as an ex-prosecutor and as a practicing defense attorney both before and since my State's Attorney tenure.

"I would have been most satisfied as a State's Attorney with much less than the total evidence that was presented in the case to sustain a first degree finding.

"As a defense counsel and as I explained to Mr. White, we had an uphill battle all the way in view of the evidence that I had seen in this case, and I felt that if we could have entered a plea of guilty to murder in the second

degree and have it accepted by the State and the Court, that would have been my recommendation.

"I further discussed with the Defendant that I had attempted to make these arrangements and was unsuccessful both with the Court and with the State" [5] (H.C. 183–184).

Pairo was convinced that petitioner could not reduce the guilt from first degree to second, but that by his testimony he might increase the penalty to the supreme one (H.C. 202–203).

Pairo understood "that [White's] boss had been his lawyer and was his lawyer, who did not practice full time * * *". White did not complain of police maltreatment and stated that he confessed because he "wanted to get this thing off his mind and that is why he told them everything." Pairo did not ask him whether he gave a "voluntary statement" because "I don't think the man would have understood what I was talking about." His inquiry was in a more colloquial manner. Pairo was asked to interview the eye-witnesses and an additional list of witnesses by White. He did not do this saying that it was his practice not to interview State's witnesses prior to trial unless some weakness or discrepancy has been disclosed in their statements, which he had read.

After the State's case was concluded, White told Pairo, for the "first time", that he wanted to take the stand. This was inconsistent with an earlier decision by him and against Pairo's advice which was that it might have an "adverse effect." White "wanted the judge to hear his version." Also he did this as an "overture" to his mother-in-law to show that he was concerned about his children. Pairo's other recollection from trial is that John Hodge and Mrs. Harris testified for the State, while in actuality they were defense witnesses. White seemed "pleased and happy" after sentence was rendered; "not with the life

sentence, but in the fact he had not received the supreme penalty".

Pairo never saw, heard from or attempted to communicate with White after the date of trial. He advised him that day of his right to motion for a new trial or appeal. He did not inform him of the procedure for doing this, however. He did advise petitioner to communicate with him promptly "if he had such ideas or desires".

As to the lack of any effect of the shotgun on Petitioner's statement, Pairo testified:

"Q. Do you recall he said that the first thing that happened after he was arrested, before he gave any indication to the police that he had done the shooting, he was presented with a shotgun. Do you recall his saying that?

"A. No sir; I recall his saying that yesterday.

"Q. Do you recall that he raised this issue, brought this to your attention during his discussions with you?

"A. That is the first time I heard it was yesterday. He told me that he had identified the shotgun as being his at the police station.

"Q. Did he ever indicate to you that the showing of the shotgun had induced him to give a statement to the police?

"A. To the contrary, his statement was that he wanted to clean up the whole mess and get if [sic] off his mind, and he went back to the scene to tell the police what happened and to give himself up, and he didn't go into any detail that it happened at 1216 East Madison Street; he then immediately got to the police station; he made no comment about the police taking him

---

5. Petitioner's counsel seemed to agree by his statement: "The State's case contained absolutely no evidence which would

smack of justification of any sort, the cold case of, apparently, calculated murder" (H.C. 204).

out of the cab, or pulling him out of the cab, or arresting him or handling him, or not handling him; that he went to the police station and gave them a full and complete statement" (H.C. 211–212).

## THE LAW

The specific issues tendered as a result of the first hearings are:

1. Waiver of the right to raise questions as to alleged illegally obtained evidence and as to the use of petitioner's confessions.

2. The seizure of evidence.

3. The use of oral admissions and typed confession.

4. The "Judicial confession".

---

### 1. *Waiver*

Respondent contends that petitioner has waived his right to raise in this Federal habeas corpus proceeding the issues of illegal arrest and illegal search and seizure, through his failure to exhaust available state remedies; in that he made no motion for a new trial; did not take a direct or belated appeal; and did not raise these issues in his first Post Conviction proceeding.

Chronology is here important.

Petitioner was convicted on June 13, 1961. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) was decided June 19, 1961. Petitioner's right to file for a new trial, expired on June 16, 1961. His right to file a notice of appeal expired July 13, 1961. On July 26, 1961, his first petition for Post Conviction relief was filed. That petition alleged as one ground for relief that:

"The unsigned statement of petitioner should not have been used in evidence against him".

Under this contention, and with the liberality to be accorded pro se petitions, petitioner could have raised any basis upon which it could. be contended (successfully or not) that the unsigned statement was inadmissible; e. g., that it

was the result of the products of an illegal search and seizure; that it was involuntary; that it resulted from the denial of the right to counsel, etc.

While the court entertains some doubt as to petitioner's testimony that he had not heard about Mapp until the evidentiary hearing, his trial counsel was uncertain as to when he realized the effect of its holding; and he did not get in touch with petitioner to explain its impact.

The court accepts Pairo's testimony over the denial by petitioner, that he explained to petitioner his right to file for a new trial, and to appeal (the jailhouse 3 and 30—H.C. 207) and his willingness to discuss an appeal with petitioner. He did not, however, explain the grounds upon which relief of either kind could be sought.

The court accepts petitioner's testimony that he was not familiar with the possibility of a belated appeal; although it is passing strange that the jailhouse lawyers did not bring it to his attention.

■ Under all the circumstances, the court is unable to find that petitioner's failures, mentioned above, were a deliberate bypassing of the orderly procedure of the state courts (Fay v. Noia, 372 U.S. 391, 438–439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)), or the voluntary relinquishment of a known right (Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).

The defense of waiver is denied.

### 2. *The Seizure of "Evidence"*

The testimony, summarized at some length above, shows that Hirsch, before going to 1213, interrogated some five persons at or immediately adjacent to the scene of the shooting in 1216; learned that Peter Rabbit had been shot and killed by petitioner with a shotgun blast; and that petitioner had immediately left with the gun and gone into 1213, and had not been seen to emerge. Hirsch with three others immediately went to 1213, and upon knocking and receiving no response, forced the front door and entered, each covering the other. They

searched only those places in which a person might be hiding, and in so doing found a shotgun behind a door, where a person might be hiding. The gun smelt of a recent discharge. After the search failed to disclose any occupant of the house, the gun was taken to 1216, and was there when petitioner returned.

■ The court finds that the police had reasonable grounds to believe that a felony had been committed; that petitioner was the guilty party; and that he had fled with the gun into 1213, and was probably still there, with the gun. In such a case of hot pursuit the entry, search, and seizure of the shotgun was not an unreasonable search and seizure. Johnson v. United States, 333 U.S. 10, 15 (footnote 7), 68 S.Ct. 367, 92 L.Ed. 436; District of Columbia v. Little, 85 U.S.App.D.C. 242, 178 F.2d 13 (1949); People v. Gilbert, 63 Cal.2d 690, 47 Cal. Rptr. 909, 408 P.2d 365 (1965); State v. Chinn, 231 Or. 259, 373 P.2d 392 (1962); Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). Hall v. Warden, 313 F.2d 483, 493 (4 Cir. 1963) and Walker v. Peppersack, 316 F.2d 119, 125 (4 Cir. 1963) are consistent with these holdings, and of course, a case arising out of this District Court directly on point is Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

Having found the shotgun under these circumstances, the police were not required to leave it, for the possible use of a killer who was concealed but unfound, or who might return at any time, and use it again.

Petitioner's counsel, with commendable diligence plays all the changes in attacking the entry into 1213, and the seizure of the gun.

■ a. It is contended that because Hirsch could not, five years later, recall the order in which he spoke to each of the five, and exactly what each said, there was no probable cause to believe petitioner to be guilty of a felony, or reasonable grounds to justify a search.

That there were reasonable grounds to believe that a felony had been committed by someone, and that the someone, whoever he might be, had fled to 1213 with the shotgun, the court believes clearly to have been established factually and as a matter of law.

■■■ b. Under the facts, Miller v. United States, 357 U.S. 301, 308, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1957), is inapplicable. Perhaps if petitioner had been found in 1213, the failure of the police to sign their death warrant by announcing their office and purpose might have made the arrest illegal. Clearly, however, the rule was intended to permit the occupant to give peaceful access to the house, and to surrender peacefully. The most mellifluous and detailed recital of "we are members of the police force of Baltimore City; we have come to arrest the killer of Peter Rabbit" would have fallen, not upon keen or deaf ears, but upon empty rooms, incapable of giving or denying access.

■ c. It is further contended that the intent to make an arrest was not the sole purpose of the entry and search. The manner of entry—the first two officers being covered by the other two, and in turn covering the other two, is clearly the conduct of officers searching for a dangerous person. Moreover the search itself, according to the testimony of Hirsch, was conducted in a manner designed only to disclose the presence of a hiding man. The discovery of the gun was accidental.

■ d. By an attempted stop watch reconstruction of times, it is contended that the police had actual knowledge or constructive notice that petitioner was not in 1213 before the search was completed. (Whether this occurred before or after the shotgun was discovered is not disclosed.) Hirsch, however, testified, and the court believes him, that he did not know that petitioner was returning to 1216 until after the search had been completed. Hirsch was in charge of the investigation, including the search.

Petitioner has cited no authority for the proposition that information communicated to a telephone operator (even if received by him before the completion of the search, as to which there is no affirmative evidence) immediately becomes binding upon the whole police force.

The contention is without merit.

■ e. Petitioner further contends that as the police were "legally on the premises only for the purpose of arresting petitioner" [but see c, above], there was no right to make a legal search and seizure. Sole reliance for this contention is placed on Gross v. State, 235 Md. 429, 201 A.2d 808 (1964).

That case, however, is clearly distinguishable.

There, after the body of a murdered man had been found in one hotel room, it was reported that appellant had just left that room and gone to her own room. After knocking at appellant's room and receiving no answer, the police were admitted by pass key. They could immediately determine no one was in the room. They saw an incriminating note, and seized it. Also, there was some evidence that the entry into appellant's room was "to search for the murder weapon" (235 Md. 436–437, 439, 201 A.2d 808, 812).

In this case, it was not certain whether or not petitioner was in fact concealed and undiscovered. In any event, he could easily return, having access through at least the front and rear door.

In *Gross,* a single policeman with safety could have prevented the removal or destruction of the note, and in the meantime application for a search warrant could have been made. The converse was true in this case.

The court concludes that the shotgun was properly seized and retained by the police.

### 3. *The Use of the Oral Admission and Typed Confession*

■ Petitioner's prime contention as to the inadmissibility of his oral statements at 1216 (described by Hirsch as similar to the written confession) and to the written confession are that they were the result of coercion occasioned by being confronted with the gun; that the gun having been illegally seized, this "tainted" these statements. The court has heretofore held that the seizure of the gun was proper; hence its "use" would not be improper. However, even if the seizure of the gun, and its exhibition to petitioner was error, the court is of the opinion that this played no part in the giving of the statements.

a. Before petitioner returned, he had already told at least four persons (his mother-in-law, sister-in-law, the cab driver and the police telephone operator) that he had killed (or shot) a man. Clearly the gun was unrelated to this.

b. Petitioner was returning to surrender himself. He gave his statements because "he wanted to get this thing off his mind and that is why he told everything" (H.C. 188). " * * * The question I asked him was why did he make a confession in this case, and his answer was he wanted to get it off his mind and give himself up, and then he explained to me in detail why he did what he did and how he did it" (H.C. 189, and see also 212).

c. The court finds as a fact that petitioner saw the body before making the original oral statement. When his attorney was questioned as to whether petitioner had ever claimed that the showing of the shotgun had induced him to give a statement to the police, his reply was:

"A. To the contrary, his statement was that he wanted to clean up the whole mess and get if [sic] off his mind, and he went back to the scene to tell the police what had happened and to give himself up, and he didn't go into

any detail that it happened at 1216 East Madison Street; he then immediately got to the police station; he made no comment about the police taking him out of the cab, or pulling him out of the cab, or arresting him or handling him, or not handling him; that he went to the police station and gave them a full and complete statement" (H.C. 212).

d. The court finds it difficult to understand how the sight of the shotgun could have had a coercive effect upon petitioner. He never at any time denied that he had done the shooting, or that it was done by a shotgun.

▆▆▆▆ Insofar as objections to the written statement are based upon either the prior oral statement, or the confrontation with the gun at the police station, the above considerations are dispositive. With respect to the further objection that the written statement was inadmissible because petitioner was denied counsel, the court likewise finds this to be untenable.

i. Petitioner had ample opportunity to call Raker, if he wanted him, from a public phone booth or from his mother-in-law's house before turning himself in.

ii. The court accepts the testimony of Hirsch that at no time did petitioner ask permission to call an attorney, and that had he so requested, he would have been permitted to do so.

iii. Petitioner had no reluctance to giving a statement which was typed in his presence, but consistently refused to sign it until his "boss" read it. His boss was not a full-time practitioner, and had no experience in the criminal law.

iv. In the trial court, petitioner admitted that he "had made the statement,

that it was voluntary, and that" he "had no objection to it * * *" (H.C. 122–123; Tr. 87, 88).

The court finds that the typed statement was properly admissible in the trial court.

4. *The "Judicial Confession"*

In reversing this court's holding that Petitioner's testimony at his trial was a judicial confession, the Court of Appeals said (352 F.2d 470 at 472):

" * * * The defendant, responsively, said he had been told of his right not to testify, but, of course, there was no probing behind his statement of his wish to do so. More particularly, there was no warning, and no reason for him to foresee, that what he had to say might be treated as a plea of guilty to the offense as charged in the indictment."

It must be assumed that the foregoing statements implicitly carried the qualification that they were based *solely* upon the record before the court. The full trial record, and the habeas corpus proceedings, cast a different light upon the actual facts. The court finds that prior to petitioner taking the stand there had been a full "probing" of the pros and cons of petitioner testifying, and that it had been agreed that he would not take the stand. Both his counsel at the trial, and his habeas corpus counsel, were satisfied that the State had made out a case of first degree murder and that the only question was as to the penalty.[6] On that aspect his trial counsel had repeatedly warned him that he might talk himself into the death penalty.

Petitioner's statement that his attorney wanted him to take the stand is not accepted by the court. It is directly contrary to Pairo's testimony. The reason assigned by petitioner to Pairo that "he wanted me to take the stand and testify to encourage my mother-in-law"

---

6. There is a suggestion by the Court of Appeals that intoxication might have kept the offense from being first degree murder (352 F.2d 473, fn. 8). Pairo had carefully considered this matter, and petitioner had told him he had been drinking but was not drunk (H.C. 205–06). No point as to intoxication was made by his habeas corpus counsel.

(H.C. 127); that "he told me he wanted me to testify that it might encourage my mother-in-law to better testify whatever it were" (H.C. 128) and that "That is the only reason I took the stand, sir" (H.C. 128) is incredible; and is totally inconsistent with Pairo's testimony, which the court accepts.

■ The record clearly established that petitioner, although freely admitting the shooting, felt that it was fully justified, and in accordance with the manner in which disputes were settled in the "concrete jungle". Pairo also explained that testimony to that effect could not help, but might seriously harm, petitioner. At the end of the State's case, petitioner insisted on taking the stand. His contention that he was forced or advised by Pairo to take the stand is not believed by the court and is not supported by the record.

In its opinion the Court of Appeals further stated:

" * * * If his testimony is viewed as a binding admission, the inferences should be in his favor, not against him. The defendant in a murder trial, who voluntarily takes the stand and there testifies that his was the hand that took the life but justifies his conduct as self-defense [7] or mitigates it or controverts any of the essential elements of murder in the first degree, cannot be said to have voluntarily and knowingly confessed in open court the maximum charge he is contesting * * *" (352 F.2d 473).

This language has troubled, and continues to trouble, this court, which is reluctant to believe that this is intended as a guarantee of an insulated risk—free ride to any defendant who takes the stand. Presumably no sane plaintiff or defendant in a civil case, and no

defendant in a criminal case, takes the stand intending to hurt himself, but it is equally obvious that he may in fact do so. This court had always understood that a witness assumed that risk, whether or not he fully realized it; and that he cannot avoid the consequences of his testimony by saying "I intended only to help, not hurt, myself"; or "I did not know I could hurt myself."

In this case, petitioner did expose himself to this risk, and he was well aware that there was a substantial risk. He was asked:

"Q. Didn't you know when you took the stand that anything you said would [could?] have been used against you in convicting you?"

His answer was:

"A. When you take a man who's illiterate and ignorant and in jail and fighting for his life and liberty and a whole lot of damage evidence is piled up against him *he has to take all kinds of chances, whether it hurt him or save him*" (H.C. 128; emphasis added).[8]

Certainly the exposure to which petitioner subjected himself was no more compelling than, and just as binding as to its consequence, as that approved by the Supreme Court in McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 1471–1472, 28 L.Ed.2d 711 (1971).

There the court discussed the risks a defendant took in testifying, and said (91 S.Ct. 1471):

"Further, a defendant whose motion for acquittal at the close of the Government's case is denied must decide whether to stand on his motion or put on a defense, with the risk that in so doing he will bolster the Govern-

---

7. This court is unaware that anywhere has it been contended by petitioner, or on his behalf, that what he did was done in self-defense. Leaving the scene of an argument with an unarmed man, crossing the street, entering another house, getting a shotgun, returning, and apparently without another word shooting his victim, not even remotely resembles self-defense.

8. This is of course inconsistent with his immediately preceding statement that the only reason he took the stand was to encourage his mother-in-law in her testimony "whatever it were" (H.C. 127–128).

ment case enough for it to support a verdict of guilty".

This court has held above that the seizure of the shotgun, and its admission in evidence along with the oral confession and the written statement was proper. If this be correct, petitioner's testimony in open court was at the best, or worst, surplusage or cumulative.

 Even if the shotgun and confession and statement were not admissible, petitioner's testimony, after advice from his counsel not to testify, and with full appreciation of the risk he was voluntarily taking, whether it be classified as a judicial confession, an admission against interest, or simply testimony relevant as to guilt or innocence, justified the conviction of first degree murder. The case would be within Chapman v. California, 386 U.S. 18, 21–23, 87 S.Ct. 824, 17 L.Ed.2d 705, particularly since it was tried non-jury.

On each and all of the foregoing, the court indicated to counsel its inability to hold that on the basis of the original habeas corpus hearing petitioner was entitled to the relief prayed. Accordingly, a further hearing was held on the points:

### 5. *Knowing Use by the State of Perjured Testimony*

 This may be dealt with summarily. No evidence was offered of the use of perjured testimony. If it can be contended (as apparently it is not) that perjured testimony was used, there is no evidence that the State was aware of that fact.

### 6. *Incompetence of Counsel*

As previously indicated, approximately eighty percent of what was originally advanced as evidencing incompetence of counsel was offered at the first habeas corpus hearing, although consideration of its alleged significance was postponed.

The additional testimony in substance disclosed that Pairo, because of the conclusive evidence against his client, consulted the Assistant State's Attorney to whom the case had been assigned, in an effort to determine whether a plea bargain could be made. The Assistant State's Attorney refused to consider any plea other than one of first degree murder. He agreed with Pairo, however, that the death penalty should not be imposed. The two discussed the problem with the trial judge to whom the case had been assigned. Apparently the conference assumed, without any detailed discussion of the facts, that a finding of first degree murder would probably result, the discussion primarily relating to the penalty. On the arguments of Pairo, and apparently on the concurrence of the State's Attorney, the judge, in Pairo's opinion, gave either a strong indication, or there was an understanding, that the judge would not impose the death penalty (H.C. 260–262). According to Pairo, this was immediately communicated to petitioner. Petitioner denies this. The court accepts Pairo's testimony on his appearance on the stand; the inherent probabilities; and the completely incredible testimony of petitioner that he never at any time discussed possible penalties, or "what could happen to him". (H.C. 289–290).

The contentions of incompetence of petitioner's trial counsel, based upon the evidence adduced at both hearings, as urged by petitioner's counsel (not the same as at the first hearing) are understandably exhaustive. While they for the most part range from nit-picking to Wednesday (not even Monday) quarterbacking, they are sympathetically received by the court which realizes that the failure of appointed counsel to run the gamut of objections, however, weak or even preposterous, will in turn be the basis of a claim against him for alleged incompetence.

 The only point deserving serious consideration, is that relating to the conferences with the trial judge, and the subsequent trial of the case before him. As above set forth, the court is satisfied that Pairo immediately disclosed the (assumed) result of this conference; which is corroborated by the agreement that

petitioner should not take the stand, lest he should lead the court to reconsider, and perhaps impose the death penalty.

This recommendation of Pairo is criticized as "strange" since as "White would not get the death penalty, there was little White could have said to worsen the situation". (Petitioner's Supplemental Brief, p. 5, footnote 2) This court disagrees. Any representation by a court as to probable sentence is (unless it is associated with a proposed guilty plea, which in fact is entered) tentative, based upon the facts as then understood. Evidence later discovered or adduced more detrimental to a defendant leads to an "all bets off" situation; and the court is entirely free after the trial of the case to impose the same tentative penalty, or a more or less severe one.

As Pairo clearly expressed it:

"I felt * * * that he might be put in a position where the penalty could be increased to the supreme penalty, and I felt that it was dangerous for him to [take the stand] * * * and I told him so" (H.C. 202).

 Petitioner's counsel claims that Pairo erred in failing to tell petitioner that he had three alternatives:

1. To go to trial before the trial judge "secure in the knowledge that" the judge "would not give him the death penalty" but with knowledge that a finding of less than first degree murder was unlikely.

Petitioner could not be "secure in the knowledge that" he would not receive the death penalty if on the stand he earned it. That the verdict would be first degree murder was the opinion of Pairo, the Assistant State's Attorney and petitioner's habeas corpus counsel.

2. To go to trial before the trial judge with a jury "secure in the knowledge" that the trial judge would not give him the death penalty.

There was no such security in a jury trial. While the jury might bring in a verdict of murder in the first degree "without capital punishment" in which event the judge could not impose the death sentence (Maryland Code of Public General Laws, Article 27, Section 413), the jury in this case might well have attached no qualification. This might have led to the imposition of the death penalty either (a) because of the nature of the evidence, and/or (b) the feeling by the court that the failure of the jury to qualify its verdict was a strong indication that the jury really favored the death penalty.

3. To exercise his constitutional right of removal, with the realization that if found guilty of first degree murder he might receive the death penalty. In the light of the commitment of the trial judge not to impose the death sentence (unless more serious facts were developed), for Pairo to have suggested removal, especially to a county jury (where the mores of the concrete jungle would be very unsympathetically viewed) would, if removal had been had, and the death penalty imposed, have raised a much more serious question of competence; although probably falling within the field of trial strategy.

The situation is not similar to Walker v. Brough, 368 F.2d 349 (4 Cir. 1966) where it was held that trial before the judge before whom the arraignment had been held at which defendant tendered a plea of guilty which was received but stricken, was prejudicial error. In this case counsel for petitioner received assurance from the trial judge that the death penalty would not be imposed.

The remaining allegations of incompetence deserve, and will receive, shorter shrift.

 It is contended that the "failure to follow up" Dr. Guttmacher's report was a denial of effective assistance. Dr. Guttmacher stated that petitioner's interpretation of events "strongly suggest paranoid thinking". However, his conclusion was that petitioner was not insane. No amount of follow up would

allow a conclusion of insanity or intoxication in view of petitioner's conduct immediately after the shooting. He had sufficient presence of mind to return the murder weapon to his residence; to check on his small daughter's well being; to tell Buckwheat whom he had shot that he could not help him at that time because he wanted to get someone to look after his daughter; to hail a cab and stop en route to call the police to say that he was returning; to continue to his mother-in-law's house and arrange for care of his daughter; and in fact to return to the scene of the crime to turn himself in.[9]

■ Finally, it is contended that the failure to contact Dorothy Gray (and, apparently, to call her as a witness, H.C. 286) was incompetence. Dorothy Gray was in court at the trial. Had Pairo called her as a witness, a serious question of competence would really exist. Her statement (Ex. 7) showed premeditation, deliberation and motive; would without question have made the crime first degree murder; and might well have led the trial judge to impose the death sentence.[10]

It is only fair to say that in the court's opinion Pairo gave petitioner excellent representation; and that the "deal" he made was unquestionably in his client's best interest.

Finding no merit in any of the contentions, the petition for a writ of habeas corpus is hereby dismissed.

The clerk is directed to send copies of this Memorandum Opinion and Order to the petitioner, and to counsel of record.

9. It is also suggested that Pairo erred in failing to raise the defense of "diminished responsibility", a defense held some five months later by the Maryland Court of Appeals not to be available. Armstead v. State, 227 Md. 73, 175 A.2d 24 (1961). A correct recognition of what the law is, before it has been officially decided, would seem to be the converse of incompetence.

10. Her testimony would apparently have been in conflict with that of Hodge that his bedroom door had been broken. Dorothy Gray in her statement said that " * * * Eddie came back to my house then he run upstairs and unlocked his cousin's trunk and got a shotgun. He loaded the gun and then he left * * * ".